# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2011-DR-00028-SCT

*ERIC MOFFETT*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/16/2010 |
| TRIAL JUDGE: | HON. TOMIE T. GREEN |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR PETITIONER: | OFFICE OF CAPITAL POST-CONVICTION RELIEF |
| | BY: LOUWLYNN WILLIAMS |
| | GLENN S. SWARTZFAGER[1] |
| | TERESA L. NORRIS |
| ATTORNEYS FOR RESPONDENTS: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JASON L. DAVIS |
| | MARVIN L. WHITE, JR. |
| NATURE OF THE CASE: | CIVIL - DEATH PENALTY - POST CONVICTION |
| DISPOSITION: | PETITION FOR POST-CONVICTION RELIEF IS DENIED - 04/24/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**RANDOLPH, PRESIDING JUSTICE, FOR THE COURT:**

---

[1]Effective July 31, 2013, Attorney Swartzfager resigned his position as Director of the Mississippi Office of Capital Post-Conviction Counsel; however, he notified this Court that he will remain as counsel of record on a pro bono basis as well as the sponsoring local counsel of record for Teresa L. Norris.

¶1. Eric Moffett was convicted of capital murder and sentenced to death by a jury. The jury determined that the murder of a five-year-old child was: (1) committed while Moffett was engaged in felonious abuse and/or battery of a child; and (2) especially heinous, atrocious, or cruel.

¶2. Moffett's conviction and sentence were affirmed by this Court on direct appeal, and his motion for rehearing was subsequently denied. *Moffett v. State*, 49 So. 3d 1073 (Miss. 2010). Moffett sought relief in the United States Supreme Court by way of a petition for writ of certiorari, which was denied on October 3, 2011. *Moffett v. Mississippi*, ___U.S.___, 132 S. Ct. 127, 181 L. Ed. 2d 49 (2011). Moffett has presented a motion, an amended motion, and a supplemental motion seeking post-conviction relief.

¶3. Moffett was convicted of a savage sexual assault on a five-year-old girl, culminating in her death. Compelling evidence supported his conviction, including conclusive DNA evidence, eyewitness testimony, and a confession, *inter alia.* Moffett primarily is focused on ineffective-assistance-of-counsel claims, which we categorize into three parts: (1) ineffective assistance of Andre' de Gruy and Dan W. Duggan, Jr., trial counsel, (2) ineffective assistance of de Gruy and Allison R. Steiner, appellate counsel, and (3) cumulative error. Finding no merit in any of Moffett's claims, we deny relief.

## STATEMENT OF THE FACTS

¶4. The following factual and procedural background is gleaned from this Court's opinion on direct appeal.

Felicia Griffin was sexually abused, [FN1] battered, [FN2] and murdered during the early morning hours of December 31, 1994. Felicia lived in Jackson with her two sisters; mother, Pennie Griffin; and, Pennie's boyfriend, Moffett. On December 30, 1994, Moffett, Pennie, and the three girls were at home. Moffett left the house at approximately 9:45 p.m. while Pennie was preparing to go to work. Pennie expected Moffett's mother, Florence Moffett Powell, to arrive soon to take her to work. When Powell did not timely arrive, Pennie went to a nearby gas station to phone her employer and Powell. Pennie checked on the children before leaving, and locked the door and burglar bars as she departed. After going by Pennie's home, Powell picked up Pennie at the gas station and proceeded to take Pennie to work. It was disputed at trial whether Powell was alone when she arrived at the gas station, or whether she was accompanied by her daughter, Sheritha Moffett. Sheritha testified that she had accompanied Powell and had observed Powell enter the house looking for Pennie. Powell did not testify, as she died before trial. The jury heard evidence that Moffett returned to the house a few hours later, took Felicia into the bedroom he shared with Felicia's mother, abused Felicia, and savagely raped her with his fingers and fist.

> FN1. The perineum had been savagely ripped or torn, resulting in open communication of the excretory opening of the alimentary canal with her genital orifice.

> FN2. She had bruises on her neck, face, and left leg; and petechial hemorrhages on her face.

Moffett reported Felicia's death via a 911 call and awaited the arrival of officers from the Jackson Police Department (JPD). After the police officers arrived, Moffett exhibited anger and began to behave strangely. His behavior escalated to the point that he was "out of control" and "throwing furniture," according to the testimony of police officers. Four officers subdued Moffett. He was handcuffed and arrested. From his arrest on December 31, 1994, Moffett remained incarcerated until September 7, 1995, when a grand jury returned no true bill. Moffett was released the same day. He had been in custody 250 days.

Years later, a JPD cold-case unit reviewed the file and submitted its findings to the district attorney. Moffett was indicted in April 2002. Moffett was tried, convicted, and received a death sentence in February 2006. Substantial evidence was presented at trial, including the live testimony of numerous witnesses. Witnesses included, but were not limited to, Pennie Griffin;

3

LaQuandia Griffin, the victim's sister; Donald Davis, a prison inmate; Mary Esther Pearson, a nurse practitioner; Huma Nasir, a forensic DNA analyst for a private DNA laboratory; and Detective Rod Eriksen, a JPD officer.

LaQuandia testified that she was seven years old at the time of the murder. The night of the crime, Pennie helped her and her sisters, Jessica and Felicia, get ready for bed and checked on them before she left for work. The three girls were sleeping on a pallet in a room across the hall from the bedroom shared by Pennie and Moffett. Lights were on in the girls' bedroom, the hallway, and bathroom. LaQuandia woke up and saw Moffett standing in the doorway of the girls' bedroom. She saw Moffett pick up Felicia, who was sleeping closest to the door. He took Felicia to his bedroom. He did not close the doors all the way, so she could see him. He placed Felicia down on the bed and started touching and rubbing on her chest and stomach areas. She heard Felicia making "all kind of painful cries." She then dozed off, only to be awoken later. She saw someone [FN3] in the hallway going into Pennie's bedroom. She remembered looking into the bedroom and seeing Felicia "laying in the bed and the covers were real bloody." After the police arrived, Moffett approached her, hugging and attempting to reassure her. She recalled seeing Moffett "throw a fit, . . . he was . . . yelling and screaming, . . . picking up chairs and . . . throwing things as if he cared." She saw the paramedics take Felicia away on a stretcher. She was not sure what she told the policeman who questioned her about the murder, but she did recall being afraid to tell him about Moffett, as he was still in the house at the time.

> FN3. This person was later determined to have been a paramedic.

Donald Davis, an inmate with Moffett during the 1994-95 confinement, testified. During his testimony, he read a statement he had written on September 15, 1995, [FN4] when he was interviewed by a JPD officer at the Hinds County Detention Center. Moffett had confessed the crime to Donald Davis at a Bible study on September 3, 1995. The confession had included graphic details of the crime and Moffett's attempt to seek forgiveness by inflicting injury upon himself (smashing his hand in a steel door at the detention center).

> FN4. This was after the no-bill report of the September 1995 grand jury.

Mary Esther Pearson testified that she was a nurse practitioner who provided medical services to inmates at the detention center where Moffett was incarcerated. She testified that she treated Moffett in March 1995 for an injury

4

to the middle and [fourth] fingers of his right hand. Moffett told her he had "mashed [his fingers] in a door."

Huma Nasir testified about DNA tests performed on laboratory samples taken at the emergency room, at autopsy, and at the murder scene, as well as known samples drawn from Moffett. She stated that the vaginal swab, vaginal wash, and anal swab were all positive for semen on the presumptive test, but were negative for sperm cells on the confirmatory test, indicating that there were no "physical sperm cells" remaining in the semen samples. She testified at length about DNA tests done on cuttings from the bath towel found in the bed where Felicia had been found by paramedics. The towel was positive for semen and epithelial cells, but was negative for blood. There were two stains on the towel. The first was a semen stain and the other was a mixed stain, including semen and epithelial cells. [FN5] The semen stain was found to match Moffett's DNA on all fifteen markers. Nasir testified that there was less than one chance in five trillion, nine hundred billion (5,900,000,000,000) [FN6] that the semen had come from anyone other than Moffett. As for the mixed stain, neither Moffett nor Felicia could be excluded as the source of the two sets of DNA found there. There were matches on four foci and six alleles, which Nasir described as "weak" alleles. She stated that, from this evidence, more than 99.9% of the population could be excluded as possible donors of the two components, thus, there was less than one chance in a thousand that anyone else contributed to the mixed stain.

> FN5. Epithelial cells include mucous, saliva, vaginal secretions, and skin, but not semen. Blood normally would be included in the epithelial portion, but not here, as the towel was found to be negative for blood.

> FN6. This is more than nine hundred times the estimated population of the entire world in 2006. Population Reference Bureau, 2006 World Population Fact Sheet 5 (chart), *http://www.prb.org/pdf 06/06 world data sheet. pdf* (last visited September 4, 2010).

Pennie testified that, on the morning of December 30, 1994, she and Moffett had an argument and that he hit her "upside the head." She stated that, at that point, she decided to end the relationship with Moffett and that she wrote him a letter telling him that it was over. Police Lieutenant Rod Eriksen testified that the letter, which he saw as establishing a possible motive, was found in the bedroom where Felicia was found. The jury viewed a videotape, taken as

Eriksen and the crime-scene investigator carried out their investigation of the scene. The jury saw, inter alia, Eriksen discovering the letter at the scene.

Several other witnesses testified, including, but not limited to, an emergency room physician; an emergency medical technician; JPD officers, including detectives and crime scene investigators; and pathologists.

*Moffett*, 49 So. 3d at 1077-79. Additional facts are provided when relevant to the discussion of each issue *infra*.

¶5. Moffett filed his Motion for Leave to Proceed in the Trial Court with a Petition for Post-Conviction Relief on December 7, 2011. On December 22, 2011, Moffett filed an amended motion for leave. This Court later entered a stay of Moffett's post-conviction proceedings to allow his experts access to Moffett for a mental evaluation. Moffett was then permitted to file a supplemental motion on April 8, 2013. The State has responded to Moffett's motions.

## ISSUES

¶6. "The procedural bars of waiver, different theories, and res judicata as well as the exceptions thereto contained in Miss. Code Ann. § 99-39-21(1)-(5) are clearly applicable to death penalty post-conviction relief applications." ***Powers v. State***, 945 So. 2d 386, 395 (Miss. 2006). Moffett carries the burden of demonstrating that his claims are not procedurally barred. *Id.* (citing Miss. Code Ann. § 99-39-21(6)). If successful, he then must make a substantial showing of the denial of a state or federal right. Miss. Code Ann. § 99-39-27(5).

¶7. With regard to trial counsel, Moffett claims he received ineffective assistance from de Gruy and Duggan, asserting they failed to object to: comments by the prosecutors; the

6

admission of prior consistent statements into evidence; testimony regarding whether the victim's injuries were heinous, atrocious and cruel; testimony by the victim's family members regarding his sentence, and portions of the State's closing argument during the sentencing phase. He also asserts they were ineffective for failing to: perform an adequate pretrial investigation; arrange for Moffett to have a mental-health evaluation; and renew the defense's motion for a "cooling off" period between the guilt and sentencing phases of trial.

¶8. Moffett also complains that his appellate counsel, de Gruy and Steiner, were ineffective for failing to raise some of the aforementioned ineffective-trial-counsel claims on direct appeal. He now asserts that those issues should have been raised as plain error given the fact that he was represented on appeal by one of the same attorneys who tried his case. Finally, he asserts that he is entitled to relief due to cumulative error.

## ANALYSIS

¶9. The test for ineffective assistance of counsel is well-settled. "The benchmark for judging any claim of ineffectiveness [of counsel] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984). In order to prevail on such a claim, Moffett must demonstrate to this Court that counsel's performance was deficient and that the deficiency prejudiced the defense of the case. *Id.* at 687. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the

7

adversary process that renders the result unreliable." ***Stringer v. State***, 454 So. 2d 468, 477

(Miss. 1984) (citing ***Strickland***, 466 U.S. at 687).

¶10.    "In any case presenting an ineffectiveness claim, the performance inquiry must be

whether counsel's assistance was reasonable considering all the circumstances." ***Stringer v.***

***State****,* 454 So. 2d 468, 477(Miss. 1984) (citing ***Strickland***, 466 U.S. at 688, 104 S. Ct. at

2065; ***State v. Tokman***, 564 So. 2d 1339, 1343 (Miss. 1990)).

> Judicial scrutiny of counsel's performance must be highly deferential. (citation omitted) . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

> **Stringer** at 477; ***Strickland***, 466 U.S. at 689, 104 S. Ct. at 2065. In short, defense counsel is presumed competent. ***Johnson v. State***, 476 So. 2d 1195, 1204 (Miss. 1985); ***Washington v. State***, 620 So. 2d 966 (Miss. 1993)[; ***Grayson v. State***, 118 So. 3d 118, 127 (Miss. 2013)].

***Foster v. State***, 687 So. 2d 1124, 1130 (Miss. 1996).

¶11.    Furthermore, even where professional error is shown, this Court must determine

whether there is "a reasonable probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different." ***Mohr v. State***, 584 So. 2d 426, 430

(Miss. 1991). When reviewing a capital-murder case, the most important inquiry is "whether

there is a reasonable probability that, absent the errors, the sentencer -- including an appellate

8

court, to the extent it independently reweighs the evidence -- would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." **Strickland**, 466 U.S. at 695. If Moffett's ineffective-assistance-of-counsel claims fail on either of the **Strickland** prongs, his claims must fail. **Foster v. State**, 687 So. 2d 1124, 1129-30 (Miss. 1996).

<u>**Trial Counsel**</u>

**1. Failure to conduct a mental-health evaluation**

¶12. This issue from Moffett's supplemental motion is discussed first because, if it had merit, it would be potentially dispositive of this matter. Moffett claims that de Gruy and Duggan were ineffective for failing to "adequately investigate, . . . ensure an accurate and thorough mental health evaluation, . . . rebut the prosecution['s] trial arguments, and . . . adequately present mitigation evidence in the sentence phase of his capital trial." This argument merges with Moffett's claim that counsel failed to perform an adequate pretrial investigation, which is discussed in the next issue. Having reviewed Moffett's supplemental issue, we find it is without merit.

¶13. Moffett urges that they failed to conduct a proper investigation into available mitigation evidence, specifically his mental health, and failed to present this evidence to the jury, thereby preventing the jury from reaching a reasoned decision on sentencing.

¶14. Moffett has presented this Court with the affidavits of Tora Brawley, Ph.D., a clinical psychologist from South Carolina; Donna M. Schwartz-Watts, M.D., a forensic psychologist;

and one of his trial attorneys, de Gruy. Moffett also provided a copy of Dr. Brawley's neuropsychological evaluation of Moffett.

*Tora Brawley, Ph.D.*

¶15. Dr. Brawley evaluated Moffett on October 16, 2012, nearly eighteen years after Felicia's murder. According to Dr. Brawley's report, Moffett told her: he has a history of heavy alcohol and marijuana use and once had a three-to-four-month period when he used cocaine on a daily basis; he denied having seizures, headaches, or other neuropsychological difficulties; he reported being "dazed" from a blow received in martial arts sparring; he now suffers from high blood pressure for which he takes medication; he now has mild increases in depression, anxiety, and irritability in reaction to his situation; his maternal uncle had a stroke; and there was no reported history of neurological or psychological difficulties in his family.

¶16. While evaluating Moffett, Dr. Brawley performed numerous tests. She opined that the cause of Moffett's mild depression and anxiety most likely was past drug and alcohol abuse. Dr. Brawley further stated that these conditions likely have improved since Moffett's incarceration because he no longer has access to these substances. The results reported in Dr. Brawley's assessment show Moffett to have a WAIS-IV Full Scale IQ of 86 (verbal comprehension 95, perceptual reasoning 82), placing him in the low average range of intellectual functioning. She stated that "testing result[s] revealed the presence of multiple scattered cognitive deficits suggestive of organicity."

*Donna M. Schwartz-Watts, M.D.*

10

¶17.    Dr. Schwartz-Watts stated in her affidavit, dated February 4, 2013, that she evaluated Moffett on October 4, 2012, and reviewed Dr. Brawley's report. It is Dr. Schwartz-Watts's opinion that Moffett suffers from a life-long anxiety disorder, characterized by excessive anxiety and worry. She attributes this disorder to his drug and alcohol use, stating that, in order to ease his symptoms, Moffett self-medicated with drugs and alcohol.

¶18.    Dr. Schwartz-Watts stated that Moffett has memory and motor-skills impairments. Further, there are strong indications that he has been exposed to abnormal levels of lead or other heavy metals. She opined that Moffett suffers from a cognitive disorder, which causes impairments in behavior, emotion and impulse control, judgment, problem-solving and memory. Finally, she opines that these conditions existed at the time of Moffett's initial arrest, which was December 31, 1994, and at the time of trial in 2006. She opined that Moffett's impairments could have contributed to his failure to cry and his anger at the crime scene.

*Affidavit of Andre' de Gruy*

¶19.    The following is an excerpt from the affidavit of de Gruy. His affidavit was provided with Moffett's supplemental motion for post-conviction relief, but it fails to support this claim.[2]

> As addressed in my prior affidavit, I was solely responsible for the mitigation investigation, preparation, and presentation in sentencing. I have been a capital defense counsel from the inception of my legal career in September

---

[2] Moffett provided two different affidavits from de Gruy. One is an exhibit to the amended application for leave, and the other is an exhibit to the supplemental filing.

11

1990. I am familiar with the standards of practice in the field, including the American Bar Association's Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, which were first published in 1989 and revised in 2003.

I did not assign a mitigation specialist to Mr. Moffett's case. *I used student interns to conduct some interviews and conducted others myself.* I did not seek or obtain a mental health evaluation. I interviewed Mr. Moffett numerous times and had him moved to the downtown jail to allow for frequent visits by me and the interns. **I did not see mental health issues as an issue in the case.**

I knew prior to trial that the prosecution intended to rely on evidence of Mr. Moffett's interaction with police officers at the crime scene to argue consciousness of guilt. The prosecutor also made this clear even during jury selection when she said that no law enforcement officers had ever seen him cry. I did not consider the possibility that his reaction could be explained by a mental health expert, although *we did examine witnesses and argue that his reactions were not indicative of guilt.* Having reviewed the limited mental health evidence current counsel has provided I still do not believe his reactions could be explained by a mental health expert.

. . .

After discovering the child brutally assaulted and killed [Moffett] placed phone calls, talked to people and eventually got angry. He explained his eventual anger as frustration because the police did not appear to be concerned about finding the perpetrator but instead were questioning him.

Prior to trial, I was aware that Mr. Moffett had a history of drug and alcohol use and contacts with the criminal justice system. I was not aware that he had been "dazed" from a blow to the head in a martial arts spar[r]ing match. Mr. Moffett and his family members were fully cooperative with me. The defense team discussed with Eric and his family Eric's involvement in football, possible childhood abuse, accidents he had and the extent of his drug and alcohol use. I don't recall any mention of his involvement in martial arts.

**I cannot say that if I had the mental health evidence that current counsel has provided me I would have attempted to use it in mitigation.** *It does not*

12

*appear to be strong mitigation and appears inconsistent with and possibly in conflict with the theory of defense and the <u>Skipper</u> [³] mitigation.*

(Emphasis added.)

¶20.  Again, this Court ". . . is to determine whether counsel exercised reasonable professional judgment in conducting its investigation based on an assessment of the prevailing professional norms, including a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." *Id.* at 217 (internal quotes omitted). This Court has held that "[j]udicial scrutiny of counsel's performance must be highly deferential . . . ," (*Strickland*, 466 U.S. at 689, 104 S. Ct. 2052) and courts have rightly "upheld decisions not to put on mitigating evidence where the decision resulted from a sound trial strategy." *Havard v. State*, 988 So. 2d 322, 334 (Miss. 2008). Further, "[j]udicial scrutiny of counsel's performance must be highly deferential. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Foster v. State*, 687 So. 2d 1124, 1130 (Miss. 1996) (citation omitted).

¶21.  Moffett's counsel initiated a mitigation investigation in which he participated. Further, the defense elected to present a *Skipper* approach in mitigation. After our reading

---

[³] In *Skipper*, the defendant attempted to offer testimony in mitigation to show that he should be spared the death penalty because he would pose no undue danger to his jailers or fellow prisoners and could lead a useful life behind bars if sentenced to life imprisonment, consistent with the mitigation strategy employed by the defense in the case *sub judice*. *See Skipper v. South Carolina*, 476 U.S. 1, 106 S. Ct. 1669, 90 L. Ed. 2d 1 (1986).

13

of de Gruy's affidavit and evaluating defense counsel's conduct from their perspective, we find that Moffett failed to carry his burden to establish that the failure to conduct a mental-health evaluation was due to oversight or dereliction. It was a conscious decision. Neither of the affidavits from Moffett's psychologists offers sufficient evidence that warrants a finding of ineffective assistance of counsel. Such evidence in mitigation would have gone against the grain of the mitigation case that was presented. Accordingly, we find this claim of ineffective assistance of counsel does not satisfy the *Strickland* standards.

### 2. Failure to perform an adequate pretrial investigation

¶22. Moffett asserts that no mitigation investigator was assigned to his case and all mitigation investigation was left to staff. De Gruy's affidavit belies this claim. Although staff-assisted, an investigation into mitigating circumstances was conducted. The fact that student interns were part of the defense team is not in and of itself deficient performance by the defense team. De Gruy also stated that he personally conducted some of the interviews.

¶23. Moffett further asserts that de Gruy and Duggan failed to conduct a proper investigation and to present available mitigation evidence, thereby preventing the jury from reaching a reasoned decision on sentencing. "[T]he failure to present a case in mitigation during the sentencing phase of a capital trial is not, *per se*, ineffective assistance of counsel." *Williams v. State*, 722 So. 2d 447, 450 (Miss. 1998). In *Crawford v. State*, 867 So. 2d 196 (Miss. 2003), this Court held that "a court is to determine whether counsel exercised reasonable professional judgment in conducting its investigation based on an assessment of the prevailing professional norms, including a context-dependent consideration of the

14

challenged conduct as seen from counsel's perspective at the time." *Id.* at 217 (internal quotations omitted).

¶24.    Moffett was represented at trial by de Gruy and Dan W. Duggan, Jr.; de Gruy has served as capital defense counsel since the inception of his legal career in 1990. Although counsel did not hire a mitigation investigator, an investigation was performed by counsel and staff.

¶25.    Moffett further asserts that defense counsel was unaware that family members were willing to testify on his behalf, and as a result, the decision not to call family members cannot be considered strategic. To prevail on this claim, Moffett must show that, had the affiants been called to testify, there was a reasonable probability that the result of the proceeding would have been different. *Spicer v. State*, 973 So. 2d 184, 191 (Miss. 2007) (citing *Mohr*, 584 So. 2d at 430).

> "To assess the probability [of a different outcome under *Strickland*], we consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh it against the evidence in aggravation." *Sears v. Upton*, ___ U.S. ___, 130 S. Ct. 3259, 3266, 177 L. Ed. 2d 1025 (2010). The United States Supreme Court has stated that there "is no prejudice when the new mitigating evidence 'would barely have altered the sentencing profile presented' to the decision maker. . . ." *Id*. at 3266.

*Chamberlin v. State*, 55 So. 3d 1046, 1054 (Miss. 2010).

¶26.    De Gruy states in his affidavit that he ". . . was aware that Mr. Moffett had family members in the local area[,] . . . did not prepare any of them to testify in order to seek mercy on [Moffett's] behalf in sentencing[,] . . . [and now alleges he] knew that [he] had erred in

15

this regard before the prosecution's closing statements were even completed." De Gruy's affidavit does not state that he did not have a mitigation strategy or claim that he failed to interview an important witness or conduct an investigation, only that he second-guessed his own strategy as the case was unfolding. Further, the affidavits from Moffett's family members provide minimal mitigation evidence.

¶27. The affidavits of Moffett's family members read essentially the same: 1) that Moffett is of good character; 2) they have memories of good times spent with Moffett; and 3) the affiants were willing to beg the jury for mercy on Moffett's behalf had they been asked to testify at sentencing.[4] They stated that they were not approached by defense counsel to offer mitigation testimony. Although defense counsel did not call Moffett's family members as mitigation witnesses, they did prepare and present a case in mitigation.

¶28. James Evans Aiken, president of a prison consulting firm, was called as an expert in corrections and classification of inmates. Aiken described for the jury what life in prison under maximum security would be like. He testified that he interviewed Moffett and was able to review records of Moffett's institutional behavior for the period Moffett was incarcerated. Moffett had fairly minor violations during that time. Aiken also testified that, if he were the warden supervising Moffett, he would have no concerns for the safety of his staff or anyone else. Specifically, Aiken testified that Moffett would be at the "lowest end

---

[4]Affidavits were taken from: Jeremy Moffett, brother; Sharima Moffett, cousin; Sheritha Moffett, sister (testified during guilt phase); James Moffett, maternal uncle; Jackie Moffett, James Moffett's wife; and Paulette Moffett Myers, cousin (daughter of James and Jackie Moffett).

of the probability scale" to harm others but at the "highest level of probability scale to be attacked or injured or a victim of violence from other inmate population." When asked if there was a record of violence by Moffett while in jail, Aiken said there was not, and there was no record of him being victimized either. It was Aiken's testimony that prior institutional behavior was a better predictor of what future institutional behavior would be, as opposed to a person's behavior in the community. Aiken opined that Moffett could be managed in a prison environment for the remainder of his life.

¶29.   Aiken's testimony offered the jury a glimpse from an independent witness of what prison life likely would be like for Moffett, *i.e.*, Moffett's life in prison would not be easy if he were allowed to live.   Further, Aiken offered independent testimony of Moffett's behavior as a nonviolent person to influence the jury to consider the possibility of life without parole.

¶30.   We are left with the question whether there was a reasonable probability that the result of the proceeding would have been different had the family members been called as witnesses. *Spicer*, 973 So. 2d at 191.   Assuming, arguendo, that Moffett satisfied the first prong, which he did not, we conclude that the result would not have been different.   Thus, Moffett has failed to show prejudice.   Plus, the United States Supreme Court has "explained that there is no prejudice when the new mitigating evidence 'would barely have altered the sentencing profile presented' to the decisionmaker, *Strickland*, *supra*, at 700, 104 S.Ct. 2052." *Sears v. Upton*, ___ U.S. ___, 130 S. Ct. 3259, 3266.   Moffett fails to meet his burden to satisfy *Strickland* standards.

### 3.    Failure to object to comments made by the prosecution

¶31.    Moffett asserts that de Gruy and Duggan were ineffective for failing to object to statements made by the prosecution to the jury venire.[5]  Moffett also asserts that they were ineffective for failing to object to statements that he alleges "vouch[ed] for the credibility of the [S]tate's case and primary witness."

### (a)    Prosecutor's comments on the death penalty in Hinds County

¶32.    Moffett cites comments made by Mansell during the preliminary opening statement to the venire:

> It's been six years since we've sought a death penalty here in Hinds County. This is a very important case.  We have kept you here until almost 8:00 last Friday night.  We've got a lot of you here again, and we may have to be here again late again today.

> It's very important, because I want you to listen, and I'm going to briefly tell you, I'm just going to touch on some of the highlights, because this is just a mini opening statement right now.  But I'm going to tell you why the State of Mississippi is seeking the death penalty in this case.

¶33.    After giving a description of what the State intended to prove, the prosecutor concluded by saying: ". . . at the end of this case I'm going to ask you to impose a death sentence.  If I have ever seen a case that deserves it, this one deserves it."

¶34.    During closing argument, Mansell stated:

> I have been doing this for 11 years.  I have never, seen an injury to a child like that, never. Never, never, never. And I do this for a living.  I do the gross disgusting things that nobody else wants to do.  I see the horrible crime in

---

[5]The prosecutors in this case were Rebecca Mansell and Stan Alexander.

Hinds County. I see what people do to children. I've never seen an injury like that to a child.

¶35. Moffett further complains that Mansell said, "[w]e would not have you up here unless we were 100 percent convinced that [Moffett] was guilty. Wouldn't do it. I'm not going to waste your time." Further, she stated, "I bring cases to juries that I am 100 percent convinced that the defendant is guilty, that the physical evidence as well as the witnesses support that fact that that defendant is guilty beyond a reasonable doubt." These statements drew no objections.

¶36. Moffett argues that the prosecutor's comments on the rarity of seeking the death penalty in Hinds County and her experience amounted to invoking her position as the government's attorney and thus, de Gruy and Duggan were ineffective for failing to object to these comments. He cites **Holland v. State**, 705 So. 2d 307 (Miss. 1997).

¶37. In **Holland**, the defendant alleged that the prosecutor improperly invoked his position as the government's attorney when he stated: "I'm the chief law enforcement official for a three-county area. I take my job seriously." **Id**. at 347. He later stated, "I had the job of charging this crime. That has been reviewed, and we're here in court today because this is one of those rare cases." **Id.**

¶38. On review, this Court stated:

On the merits, it is improper for a district attorney, in argument to the jury, to use his position or function as a basis for convicting or more severely sentencing a defendant. More specifically, a prosecutor may not comment on the fact that he has only sought death in rare instances such as this one. This argument implies that the district attorney has made the judgment already and that his decision should be binding and persuasive to the jury.

19

*Id.* at 347 (internal quotations and citations omitted).  However, this Court went on to say that

> [t]his error does not automatically result in reversal. This statement is reviewed to see the magnitude of prejudice, the effectiveness of the curative instruction, and the strength of the evidence of the defendant's guilt. ***United States v. Goff***, 847 F. 2d 149, 165 (5th Cir. 1988), *cert. denied,* ***Kuntze v. U.S.***, 488 U.S. 932, 109 S. Ct. 324, 102 L. Ed. 2d 341 (1988). The trial court and the prosecutor told the jury that it was the jury's decision to determine Holland's punishment. The prosecutor told jury "it's just your decision." As such, error, if any, was cured. ***State v. Bey***, 610 A. 2d at 816 (N.J.1992). The Eleventh Circuit found this information sufficient to lessen the magnitude of prejudice to a level below that requiring reversal. ***Brooks***, 762 F. 2d at 1413-14. ***Id.***

¶39.    In the instant case, the comments made by Mansell during her preliminary opening statement were made to the entire jury venire, prior to individual voir dire.  The State argues that this was nothing more than the prosecutor's attempt to communicate to those potential jurors the magnitude of their service and the serious nature of the case.  Following the complained-of comments made in the preliminary opening statement, Mansell went on to say:

> But if you know in your heart you cannot do it, you cannot do it, you need to let us know.  Because the only way that we can start this case is we have to get 12 people in that box.  But when it's all over, and it probably will take us -- it's going to take us a week to get this jury in the box.  And I appreciate your patience.  I know it's tiring, and I know y'all are  probably, especially now, really not wanting to be here. And it's going to probably take a week of testimony.

¶40.    Similar to ***Holland***, after the jury was selected, Mansell unequivocally stated to the jury:

> As I told you in our general voir dire, it's been six years since we sought the death penalty.  We obviously understand the magnitude of this case.  But the

20

one thing I told you during general voir dire, and I'm going to tell you again, I with the State of Mississippi and Stan Alexander with the State of Mississippi, *we want you to base your verdict on the evidence.*

(Emphasis added.)

¶41. After reviewing the entirety of the prosecutor's statements, it is quite apparent that the prosecutor was seeking to gain the jury's appreciation for the task at hand. She made no direct comment that she has sought the death penalty only in *rare* instances such as this one. As will be discussed *infra*, the jury was properly instructed by the trial court that the decision on Moffett's guilt was exclusively the jury's. Furthermore, the prosecutor repeatedly reminded the jury that the decision was theirs to make, based on the evidence.

¶42. With regard to statements made by the prosecutor during closing arguments, it cannot be said that she implied that her decision should be binding on the jury. During closing argument, Mansell told the jury:

> I absolutely respect the jury system. I think it works. I have never not agreed with the jury system because I believe in it. So the question is what is justice. Justice is in your hands. *You get to decide* what justice is in this case. *You get to decide and you get to tell Eric Moffett what he did was wrong, or you can let him go.*
>
> But what ever you do, *we want you to make a decision.*

(Emphasis added.)

¶43. Moffett offers this issue as a claim of ineffective assistance of counsel. Assuming, *arguendo*, that Moffett's counsel was deficient for not objecting, the issue is without merit in light of the full context of the prosecution's remarks, and Moffett fails to show prejudice.

**(b)    Comments on Moffett's silence and lack of remorse**

21

¶44. If a prosecutor comments on a defendant's failure to testify, he violates the criminal defendant's Fifth Amendment right against self-incrimination. *Griffin v. California*, 380 U.S. 609, 611, 85 S. Ct. 1229, 1231, 14 L. Ed. 2d 106 (1965). Moffett asserts that the prosecutors made remarks about his lack of remorse. He complains that ". . . the prosecution did so repeatedly, beginning in the opening statements when Mansell informed the jury that Moffett '[h]as not cried once' and invited the jury to 'watch him through this trial' to see if he would cry." Moffett offered this snippet of Mansell's opening remarks. A full reading is as follows:

> And you are going to hear from the scene officers that were there. And the interesting thing they're going to tell you about that, they never saw Eric Moffett crying. He lived with this woman for three years and her three baby girls, but he never cried about it. Not once.
>
> Y'all watch him through this trial, let's see if they -- we'll see. Has not cried once. No officer will testify that they ever saw any tears come out of his eyes, not one drop.

¶45. The full text reveals that Mansell was previewing the State's case regarding Moffett's demeanor at the crime scene. Such evidence is not only permissible; it is relevant. "The demeanor, acts and conduct of an accused at the time and subsequent to the crime are admissible. However, this should be limited to a statement of the facts by the witness or witnesses, leaving the jury free to form its own conclusions." *Davis v. State*, 684 So. 2d 643, 654 (Miss. 1996) (quoting *Harrelson v. State*, 65 So. 2d 237, 239 (Miss. 1953)). Thus, we find no merit in this claim.

22

¶46.    Moffett also takes issue with the prosecution's comments made during the State's closing arguments, when Alexander said, "And even though he's sitting over there all *smug* today with his counsel surrounded by people that are going to tell you about the goodness in his heart . . . ." (Emphasis added.)  During the second half of closing arguments, Mansell said:

> I hope while Mr. Duggan was loving up on Eric Moffett y'all at least looked at him, because I haven't been able to look at him during this trial.  But every time I've looked at him all he's doing is still smacking on that gum.
>
> He acts like this is no big deal.  Have you seen any ounce of anything out of him that shows that even maybe perhaps this was a bad thing that happened [?] Y'all could see him the entire time.  Has he been smacking on gum the entire time[?] Is that someone that has no remorse[?]

¶47.    This Court has held it is improper for the prosecuting attorney to call the jury's attention to the fact that the defendant sat in the courtroom and showed no emotion, the implication being that, for that reason, he must be guilty.  **Reed v. State**, 197 So. 2d 811, 815-16 (Miss. 1967). In **Davis v. State**, 684 So. 2d 643 (Miss. 1996), during closing arguments of the sentencing phase, the prosecutor stated, "I haven't seen remorse." **Id.** at 654.  This comment drew an objection on the grounds that it concerned Davis's failure to testify. **Id.** Davis asked that the jury be instructed to disregard it and moved for a mistrial. **Id.** The trial court did admonish the jury to disregard the statement but denied the motion for a mistrial.  **Id.**  In its analysis of **Davis**, this Court discussed **Harrelson**, and in doing so, stated:

> The demeanor, acts and conduct of an accused at the time and subsequent to the crime are admissible. However, this should be limited to a statement of the facts by the witness or witnesses, leaving the jury free to form its own conclusions. The admission

23

> of the opinion of the officers who investigated the killing that the appellant showed no signs of grief, over the objection of the appellant, was improper and highly prejudicial.
>
> *Harrelson v. State*, 217 Miss. 887, 891, 65 So. 2d 237, 239 (1953) (allowing officers to testify that a defendant showed no signs of grief). We reversed the conviction of Harrelson because he did not receive a fair and impartial trial. *Id.* "The [*Harrelson*] opinion simply recognized the unfairness of subjecting a defendant to an objective 'grieving test.' *Flanagin v. State*, 473 So. 2d 482, 487 (Miss.1985)." "This is still a good rule of law." *Kolb v. State*, 542 So. 2d 265, 269 (Miss. 1989) (citations omitted).

*Davis*, 684 So. 2d at 654. The *Davis* Court ultimately found that the admonition of the court sufficiently cured the effect of the statement. *Id.*

¶48.   In the instant case, Moffett's counsel did not object to the prosecution's comments, and no admonishment was sought. The issue was not raised on direct appeal, and had it been, it would have been procedurally barred by waiver. *See Doss v. State*, 709 So. 2d 369, 400 (Miss. 1996) (The failure of defense to contemporaneously object to improper comments from prosecutor regarding, among other things, the defendant's lack of remorse, was procedurally barred on direct appeal.). Moffett asserts that his counsel was ineffective for failing to object to the impermissible commentary on his lack of remorse during the trial.

¶49.   As a general rule, prosecuting attorneys should refrain from commenting upon the appearance of a defendant. We have reviewed the closing arguments by the prosecution, and in context of the entire argument, the fleeting comments complained of have a *de minimus* effect. Had we been asked to address this claim on direct appeal, the likely outcome would have been harmless error in light of the overwhelming evidence. The prosecutor's comments about Moffett's demeanor during the trial were made to a jury that had the opportunity to

24

personally view his demeanor for themselves. The jurors had the opportunity to form their own opinions and were not required to rely on the prosecutor's opinions. Moffett now raises the issue in his post-conviction motion as a claim of ineffective assistance of counsel. Even if we were to assume that defense counsel should have objected to the comments, we find that there is not "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Mohr*, 584 So. 2d at 430 (Miss. 1991). "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Stringer*, 454 So. 2d at 477 (Miss. 1984). This assignment of error is without merit.

### (c) Personal attacks on defense counsel

¶50. Moffett asserts that the State engaged in personal attacks on defense counsel. He relies on *Edwards v. State*, 737 So. 2d 275 (Miss. 1999). In that case, this Court noted that "[i]nappropriate or improper prosecutorial remarks are not necessarily reversible error." *Id.* at 300. The test, again, is ". . . whether the natural and probable effect of the prosecuting attorney's improper argument created unjust prejudice against the accused resulting in a decision influenced by prejudice." *Id.* (quoting *Dunaway v. State*, 551 So. 2d 162 (Miss. 1989)).

¶51. In *Edwards*, the prosecutor made the following comments during closing argument:

> But, instead, ladies and gentlemen, he made an argument that, quite honestly,
> I don't have sympathy as I thought I would for him, because I can't believe

that anybody could get up here with a straight face and argue to you the things that he has just argued. . . .

Quite honestly, ladies and gentlemen, it boggles my mind as to how anybody could argue such a ridiculous proposition, other than the fact I realize they have a job to do and they have to come up with something. But it is still mind boggling how anybody can stand here with a straight face in front of you and say we haven't proven that. . . .

Now, that does tee me off, ladies and gentlemen, for the defense lawyer, the man who is representing the man who made those maggots infest that man's head, that man over there is defending the dignity of Tony Roberts by telling you that the photographs that show the bullet holes in his head don't show something important in this case? . . .

*Id.* This Court found those comments to be "egregious" and found it to be one of five errors, while stating that the "error alone may or may not have resulted in reversibility." *Id.* at 301.

*Alexander's closing argument.*

¶52.    Moffett complains that Alexander, in anticipation of what the defense might argue in closing, told the jury that defense counsel might "turn flips and cart wheels" in responding to the State's evidence.  The comment complained of reads in full as follows:

> When we started this entire procedure Rebecca told you that we don't have to prove what color shoes the defendant was wearing.  We don't have to prove what color of shirt he was wearing.  We have to prove to you that he committed the crime, that he murdered and killed Felicia Griffin while in the commission of sexual battery or child abuse.  That's what we've got to prove.  What color clothes he was wearing has nothing to do with it whatsoever.
>
> Now, they might get up here and *turn flips and cart wheels* and talk about the clothes, but when you read those instructions, read them, because that's the law you've got to follow.  If you see anything in there about clothes in those instructions about what we have to prove, let him go. Anything about the clothes.

26

Those comments can hardly be considered prejudicial, personally derogatory, or especially egregious.

¶53. Moffett also claims that Alexander referred to defense arguments as "ridiculous." This is not entirely accurate. Unlike the attorney in *Edwards*, Alexander presented his portion of closing argument before the defense presented its own. With regard to whether Moffett's mother had exculpatory evidence at the time Moffett was arrested, Alexander asked the jury to consider why Moffett's mother did not go talk to the police when requested to do so. Alexander reminded the jury that she had a car. He suggested that she did not go because she would not lie for her son. Following that conclusion, Alexander hypothesized:

> I guess if it was the defense, [the police] were supposed to go down there and handcuff her and take her downtown and make her give a statement. *That's ridiculous. That's ridiculous, and each of you know it.*

Alexander's comment does not compare to the deviation from professionalism that occurred in *Edwards*, 737 So. 2d at 301.

¶54. At another point in Alexander's closing argument, the defense objected to his arguing matters outside of the evidence. After the objection was overruled, Alexander stated: "I'm going to tell you the truth. And they can say what they want when I finish." Moffett asserts that Alexander was implying that the defense would not tell the truth. Finally, Alexander concluded his argument by commenting that Moffett was "running from justice."

¶55. The argument here, again, is whether counsel was ineffective for failing to object to the remarks by the prosecutor. These comments do not compare to the prejudicial comments shown in *Edwards*, 737 So. 2d at 301. These comments lack the egregious content and

27

derogatory nature of *Edwards*. *Id*. Thus, counsel was not ineffective for failing to object. Further, Moffett does not pass the prejudice prong of *Strickland*, even if the Court were to assume, arguendo, that objections should have been made. *Strickland*, 466 U.S. at 687.

*Mansell's closing argument.*

¶56.    Moffett next complains of Mansell's final closing remark, responding to the defense: "And let's be so disrespectful to a mother that lost her child and wad her statement up in the garbage."   Moffett further complains about Mansell's final  remarks where she stated: "[LaQuandia, the victim's older sister,] gave a statement to the CASA people 11 days after this happened.  And they want to say well, she had access to the police reports.  Well, you know *that's what defense attorneys [sic] do.  They turn things around a little bit.*" (Quotations added.) Moffett maintains that these comments were clearly irrelevant to his guilt but were intended to prompt the jury to question the veracity of defense counsel's arguments.  Moffett relies on *U.S. v. Vaccaro*, 115 F. 3d 1211 (5th Cir. 1997), in which the Fifth Circuit considered a similar comment by the prosecution, yet affirmed.

> The prosecutor's statement that defense lawyers "muddle the issues" was clearly improper. The prosecutor was seeking to "draw the cloak of righteousness around the prosecutor in his personal status as government attorney and impugn[ ] the integrity of defense counsel." *United States v. Frascone*, 747 F. 2d 953, 957-58 (5th Cir. 1984). This court has been clear that "[n]o prosecutor . . . may impugn the integrity of a particular lawyer or that of lawyers in general, without basis in fact, as a means of imputing guilt to a defendant." *United States v. McDonald*, 620 F. 2d 559 (5th Cir. 1980). Nevertheless, where such an excessive statement comes in the heat of a closing argument in a hard-fought case, is objected to and immediately sustained, and subjected to an instant cautionary instruction to disregard it, it does not warrant reversal. *Frascone*, 747 F. 2d at 958.

28

*Id.* at 1218.

¶57.     Like most of Moffett's other assertions of ineffective assistance of counsel related to the prosecutors' statements, there was no contemporaneous objection or request for a cautionary instruction. The test this Court must apply to determine the underlying issue of whether the comments require reversal is still ". . . whether the natural and probable effect of the prosecuting attorney's improper argument created unjust prejudice against the accused . . . ." *Edwards*, 737 So. 2d at 300.   The comments did not rise to a prejudicial level of impugning the integrity of the defense team.

¶58.     Even if this Court were to assume that Moffett's counsel should have objected to every comment complained of, Moffett still must show that ". . . the result of the proceeding would have been different." *Mohr v. State*, 584 So. 2d 426, 430 (Miss. 1991).   The overwhelming weight of evidence (eyewitness testimony, DNA evidence, and Moffett's confession) belies the proposition that unjust prejudice influenced his conviction.   Moffett fails on the second prong of *Strickland*, even if members of this Court should agree that objections were warranted. *Strickland*, 466 U.S. at 687.

¶59.     Further, this Court has held that improper remarks made during closing arguments can be harmless error where the evidence of guilt is overwhelming. *Dancer v. State*, 721 So. 2d 583, 590 (Miss. 1998).   The evidence in this case is overwhelming, and if one assumes error for the sake of argument, it is harmless.

**(d)     Prosecutor's expressions of personal opinion**

¶60. Moffett complains that the prosecution made comments in closing arguments that were based on personal knowledge outside the evidence in the case. "The standard of review that appellate courts must apply to lawyer misconduct during opening statements or closing arguments is whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created." *Sheppard v. State*, 777 So. 2d 659, 661 (¶ 7) (Miss. 2000).

¶61. Specifically, Moffett complains that the prosecutor injected her own opinion about how long semen would remain "fresh semen." Mansell stated in closing argument: "What [the defense] can't get over is Rod Eriksen in his own report 11 years ago put in there it was fresh semen. I've seen fresh semen. I know what fresh semen looks like." She then stated that she was sure the members of the jury knew what fresh semen looks like. Mansell followed:

> Now, can I tell you how that semen on the towel got there[?] No. I know it
> came out of the penis of that man. That's the only way it got there. Can I tell
> you if he masturbated before or after[?] No. He obviously masturbated shortly
> before the police came because it was still wet and shiny.

Attorneys on both sides are generally afforded broad latitude during closing arguments. *Wright v. State*, 958 So. 2d 158, 161 (Miss. 2007). In *Brewer v. State*, 704 So. 2d 70 (Miss. 1997) (quoting *Clemons v. State*, 320 So. 2d 368, 371-72 (Miss. 1975)), this Court stated:

> [s]o long as counsel in his address to the jury keeps fairly within the evidence
> and the issues involved, wide latitude of discussion is allowed; but when he
> departs entirely from the evidence in his argument or makes statements
> intended solely to excite the passions or prejudices of the jury, or makes
> inflammatory and damaging statements of fact not found in the evidence, the
> trial judge should intervene to prevent unfair argument.

*Id.* at 72. Given the latitude which counsel is to be afforded, and considering the content of the statements, she was within the permissible bounds of closing argument, for the statements were supported by the evidence adduced.

¶62. Moffett also complains that Mansell injected personal opinions about a defense witness's testimony by comparing for the jury Moffett's mother's inaction with what she personally would have done in a similar situation. Mansell stated:

> Now, you know, they want to talk about, you know, there are two witnesses, or one witness that supposedly the mother went inside the house that could exonerate him saying, you know what, the door was open.
>
> How can you reconcile that. She was alive. We heard from 1994, December 31st, '94. We know she's alive until 1999. How do you reconcile that.
>
> *I am a mother. I have a son. If my son got in trouble, even at school, I would be the first one there to say let me tell you at least my version. I would be at the police station. If the doors were locked I would sit on the steps until they opened it so I could go in and tell them what happened.*
>
> . . .
>
> They tried twice to get her to come in. She said I'm coming in and she never showed up.
>
> . . .
>
> If that mother had information that would exonerate her child, she would have gone up to the police station and given a statement. We all know that. She didn't.

(Emphasis added.) Mansell was offering argument from which inferences fairly could be drawn based on the evidence presented. When considered in context, her arguments were

31

not designed "to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created." *Sheppard*, 777 So. 2d at 661.

¶63. Moffett next complains that Mansell argued facts not in evidence. Prosecutors are permitted to argue anything in the State's closing argument that was presented as evidence. *Hanner v. State*, 465 So. 2d 306, 311 (Miss. 1985) (citing *Zant v. Stephens*, 462 U.S. 862, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983)). "In general, parties may comment upon any facts introduced into evidence, and may draw whatever deductions and inferences that seem proper from the facts." *Ross v. State*, 954 So. 2d 968, 1002 (Miss. 2007).

¶64. Prior to discussing Donald Davis's testimony with the jury, Mansell made statements like "[p]redators want the child to come to them." Defense counsel objected when Mansell stated, "The perpetrator and predator want it to be the child's fault. The child wanted it. The child came to me – ." The defense argued that Mansell was outside the record, and the objection was overruled. Mansell later returned briefly to this line of argument without drawing another objection from the defense.

¶65. Examining Moffett's claim under the standard for ineffective assistance of counsel, he cannot show that counsel's performance was deficient because defense counsel lodged an objection. Further, it is worth repeating that this Court has held that improper remarks made during closing arguments can be harmless error where the evidence of guilt is overwhelming. *Dancer*, 721 So. 2d at 589. Given the overwhelming evidence against Moffett in this case, it cannot be said that Mansell's comments created unjust prejudice against Moffett so as to result in a decision influenced by the prejudice claimed.

32

¶66. Moffett next asserts that Mansell made inflammatory arguments with no basis in fact that Moffett had selected the victim because "she wasn't his color." The State counters that the prosecutor's comments were inferences drawn from the evidence. Specifically, Donald Davis's testimony included, "[Moffett] stated he didn't know why he did it. He wasn't drunk or high on drugs, but he felt like that Felicia wanted it done too because they, the kids at school, always made fun of Felicia saying she was a white man's baby. He, Moffett, stated that he relieved her of her pains."

¶67. With regard to closing arguments, this Court has stated that the attorney's " . . . function is to draw conclusions and inferences from evidence on behalf of his client in whatever he deems proper, so long as he does not become abusive and go outside the confines of the record." *Brown v. State*, 690 So. 2d 276, 296 (Miss.1996). Felicia's mixed race was introduced through the testimony of Davis. Given the broad latitude permitted in closing arguments, it was within bounds for Mansell to comment on Moffett's confession as to why he committed the atrocities against Felicia.

¶68. Moffett raises each of these issues under the claim of ineffective assistance of counsel, asserting that his defense counsel should have objected to the prosecutor's comments. However, as mentioned above, defense counsel did object to some of the prosecutor's arguments and was overruled. This Court must maintain the presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Moffett has failed to show that counsel was deficient. Further, even if we were to assume that counsel should have objected to every argument, Moffett has not shown related prejudice. Accordingly, his

33

ineffective-assistance-of-counsel claims do not pass the standard set forth in *Strickland*, 466

U.S. at 687.

### (e) Prosecutor's vouching for the credibility of a State witness

¶69. Moffett complains that the prosecution personally vouched for the credibility of

Donald Davis and put the imprimatur of the government and the prosecution behind him.

Many of the prosecution's comments that Moffett complained of above are reargued.

However, because they have been considered, the focus of this analysis will be limited to the

comments regarding Donald Davis.

¶70. "A prosecutor is forbidden from interjecting his personal beliefs regarding the veracity

of witnesses during closing argument." *Foster v. State*, 639 So. 2d 1263, 1288 (Miss. 1994)

(citing *United States v. Young*, 470 U.S. 1, 5, 20; 105 S. Ct. 1038, 1041, 1048-49; 84 L. Ed.

2d 1, 6, 15 (1985)).

> In *Garza*, . . . the Fifth Circuit held that the prosecutor's expression of a
> personal opinion that he believed the witnesses for the U.S. over defense
> witnesses "sought to use the status and influence of the entire governmental
> investigatory apparatus to bolster the believability of his case. It is impossible
> to imagine this strategy did not have substantial influence on the jury."

*Id*. (quoting *United States v. Garza*, 608 F. 2d 659, 665-66 (5th Cir. 1979)).

¶71. When discussing *Garza*, the *Foster* Court found the prosecutor's comments to be

improper.

> The closing argument in *Garza* is strikingly opprobrious. The defendant raised
> an alibi defense, calling a number of witnesses to testify. *Garza*, 608 F. 2d at
> 661. The case for the U.S. rested primarily on the testimony of a c.i. and a
> D.E.A. agent. *Id*. The prosecutor peppered his closing with comments to the

effect that (1) he believed the U.S. witnesses over the defense witnesses; (2) that he would not have called the U.S. witnesses if he did not believe they were telling the truth; (3) the U.S. witnesses have no reason to lie; (4) that neither he nor the U.S. Government would frame the defendant. [*Garza*,] 608 F. 2d at 661-663.

*Foster*, 639 So. 2d at 1288, (n1)

¶72.    Moffett complains about numerous comments made by Mansell. During preliminary opening statements, Mansell told the potential jurors that Donald Davis may be referred to by the defense as a "jailhouse snitch, a rat, a whatever . . ." but she assured the venire that "[h]e got nothing, no deal whatsoever. Never has." This comment does not reflect a personal opinion of Davis's veracity.

¶73.    Next, Moffett complains Mansell stated:

> And the thing about Donald Davis, the inmate, I don't like using jailhouse snitches. I've been doing this 11 years. The first time I've ever used one. And you want to know why[?] *Because he's telling the truth*. What he writes -- he wrote a statement out in 1995. There is absolutely no way he could have known the things he knew without -- he was either there or this defendant told him what happened.

(Emphasis added.) It is clear that Mansell was giving the jury a factual basis to accept Davis's testimony, based on statements he gave more than a decade earlier. The transcript reveals that Mansell also paraphrased the testimony that she expected Donald Davis to give. This situation is quite different from that of *Garza* or *Foster*, because Mansell directed the jury's attention to evidence *they* should look for. Mansell specifically told the jury that Davis either had to have been present during the crime or Moffett had to have told him the details, based on his 1995 writing. Mansell's other statements militate against jury reliance on her

35

or the government's opinion of the veracity of Davis, for during this same opening statement, Mansell said, " I'm going to tell you this now and I'm going to tell you again on my full opening, and I'm going to tell you again on closing. *I want you to base your verdict on the evidence. I don't want you to base it on anything else.*" (Emphasis added.) Mansell further stated during her opening statements made after the petit jury was seated:

And I told you what [Moffett] did. And the reason we know he did it is because he confessed to an inmate. And I'm sure we're going to have all kinds of well, he's a jailhouse snitch, he's a rat, he's a -- I can't think of all the words you can call him. You know, he's got to be a liar because he's an inmate.

Well, *you* get to *judge his credibility* and *you* get to *decide* is Donald Davis lying. What did he gain, if anything, from this confession that Eric Moffett gave him[?]

And the interesting thing -- and that's why I'm telling you I want *you* to *follow the evidence*. Look at the pieces of the puzzle. When Donald Davis gives this statement back in 1995 -- I want you to think about this. From '95 until 2006, way down here almost 12 years later, I want *y'all* to *think about this*, *did his statement change one bit in 12 years*. The answer is absolutely not. Not one thing has changed, never, nothing, no how.

(Emphasis added.) The statement complained of is hardly a ringing endorsement by the government of Davis's veracity. Additionally, Mansell continued with constant reminders to the jurors that they determine credibility.

¶74. Moffett's complaints related to Mansell's closing arguments continued to where she reminded the jury of evidence that Davis's statement about Moffett's confession had not changed in more than eleven years. She stated:

It's never changed. It's never changed.

36

And now they're going to say well, Ms. Mansell, you know, he's up for parole in a year. I bet you she's going to write him a letter. Mr. Davis told you I have consistently turned him down.

I've been doing this 12 years. I have never used an inmate in one of my cases. Never have I put an inmate on the stand, because generally I don't like them.

Donald Wayne Davis, after talking to him and looking at his statement, it was credible. He may be an inmate *but he still deserves you to weigh his credibility* like every other witness that to the stand.

(Emphasis added.) Mansell, when positing that Davis was credible, pointed to matters in evidence and told the jury his credibility was in their hands. She argued that credible evidence should not be dismissed simply because the witness was an inmate.

¶75. Like the other issues before, Moffett raises this issue under a claim of ineffective assistance of counsel for failing to object to the prosecution's comments. In order to find that counsel's failure to object amounts to deficient performance, Moffett must first show that the prosecutor's comments were objectionable. As discussed *supra*, they did not warrant an objection. However, assuming for the sake of argument that the defense should have objected, Moffett still must show prejudice, which he cannot do. The natural and probable effect of Mansell's comments did not "create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created." *See **Sheppard**,* 777 So. 2d at 661 (Miss. 2000).

### (f)    Cumulative effect

¶76. Moffett claims that the cumulative effect of the prosecutor's arguments denied him a fair trial and that de Gruy and Duggan should have objected to improper arguments.

37

However, he has not shown that his defense counsel performed deficiently, nor has he shown prejudice, even if this Court were to assume that counsel should have objected. Therefore, having considered each claim, Moffett failed to overcome the *Strickland* standard on any claim and has not shown, cumulatively, that de Gruy and Duggan were ineffective in their representation.

### 4. Failure to pursue Mississippi Rule of Evidence 801 issue on appeal

¶77. The State offered the prior, 1995 statement of Donald Davis into evidence during Davis's testimony. Prior consistent statements are controlled by Mississippi Rule of Evidence 801 (d)(1)(B). Counsel for Moffett objected to the statement, adequately preserving the issue for appeal. Moffett now complains that his appellate counsel abandoned the issue on direct appeal.

¶78. On direct appeal, Moffett's counsel presented nineteen issues for this Court's review. Appellate counsel assigned to prosecute an appeal from a criminal conviction does not have a constitutional duty to raise every nonfrivolous issue requested by defendant. *Foster v. State*, 687 So. 2d 1124, 1138 (Miss. 1996) (citing *Jones v. Barnes*, 463 U.S. 745, 749, 103 S. Ct. 3308, 3311, 77 L. Ed. 2d 987 (1983)) (An indigent defendant does not have a constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points.)

¶79. When the United States Supreme Court held that a State must provide counsel for an indigent appellant as of right, it "recognized the superior ability of trained counsel in the

38

'examination into the record, research of the law, and marshalling of arguments on [the appellant's] behalf.' ***Douglas v. California***, 372 U.S. at 358, 83 S. Ct. at 817." ***Jones v. Barnes***, 463 U.S. 745, 751, 103 S. Ct. 3308, 3313 (1983).

> Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues. Justice Jackson, after observing appellate advocates for many years, stated:

> > One of the first tests of a discriminating advocate is to select the question, or questions, that he will present orally. Legal contentions, like the currency, depreciate through over-issue. The mind of an appellate judge is habitually receptive to the suggestion that a lower court committed an error. But receptiveness declines as the number of assigned errors increases. Multiplicity hints at lack of confidence in any one . . . . [E]xperience on the bench convinces me that multiplying assignments of error will dilute and weaken a good case and will not save a bad one.

> Jackson, *Advocacy Before the Supreme Court*, 25 Temple L.Q. 115, 119 (1951).

> Justice Jackson's observation echoes the advice of countless advocates before him and since. An authoritative work on appellate practice observes:

> > Most cases present only one, two, or three significant questions . . . . Usually, . . . if you cannot win on a few major points, the others are not likely to help, and to attempt to deal with a great many in the limited number of pages allowed for briefs will mean that none may receive adequate attention. The effect of adding weak arguments will be to dilute the force of the stronger ones.

> R. Stern, Appellate Practice in the United States 266 (1981).

***Jones v. Barnes***, 463 U.S. at 751-52, 103 S. Ct. at 3314.

> For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every "colorable" claim suggested by a client would disserve the very goal of vigorous and effective advocacy that underlies *Anders*. Nothing in the Constitution or our interpretation of that document requires such a standard.

*Id.* at 754.

¶80. Appellate counsel is not ineffective for failing to raise every possible issue. Counsel is presumed competent, and counsel's decisions on what issues to present on direct appeal were consistent with appropriate appellate practice. We reviewed Moffett's underlying claim — whether the trial court erred in overruling Moffett's objection to the introduction of Davis's prior consistent statement into evidence. We find that the trial court did not err by overruling the objection. *See* M.R.E. 801. Because the underlying assertion of error has no merit, counsel cannot be faulted for not raising the issue on direct appeal. Thus, this claim has no merit.

### 5. Failure to object to testimony regarding whether the crime was heinous, atrocious, and cruel

¶81. Moffett complains that one of the State's medical experts testified that Felicia's injuries were heinous, atrocious, and cruel. On cross-examination, Moffett's expert, Aiken, also testified that Felicia's injuries were heinous, atrocious, and cruel. Moffett asserts that his counsel were ineffective for failing to object to this testimony because a medical professional and a prison-adaptation expert were permitted to give legal conclusions. Moffett further asserts that his counsel were ineffective on appeal because, despite not having been

40

preserved by an objection, this amounted to plain error and should have been raised on direct appeal.

¶82. The State maintains that this Court, on direct appeal, addressed Moffett's claim that the heinous, atrocious, and cruel aggravator should not have been submitted to the jury. *Moffett*, 49 So. 3d at 1115. Regarding this issue, the Court engaged in the following analysis:

¶143. The jury found two aggravating circumstances:

(a) The capital offense was committed while the defendant was engaged in the commission of felonious abuse and/or battery of a child;

(b) The capital offense was especially heinous, atrocious or cruel.

¶144. Moffett incorporates his argument on Issue XVI into the argument that the "especially heinous, atrocious, or cruel" aggravator ("HAC") should not have been submitted to this jury. He then adds the following arguments: (1) considering Issue XIII, insufficient evidence supports the jury's HAC finding; (2) the limiting instruction regarding HAC was unconstitutionally vague; (3) submission of the child-abuse aggravator, along with HAC, fails to narrow the class of death-eligible defendants; and (4) that this Court should reconsider its holdings that an underlying crime may be used as a capitalizer and an aggravating circumstance.

¶145. This Court has held that *Apprendi* and *Ring* do not apply to Mississippi's capital-sentencing scheme. *Bennett v. State*, 933 So. 2d 930, 955 (Miss. 2006). Mississippi's maximum penalty for capital murder is death. *See* Miss. Code Ann. § 99-19-101(1) (Rev. 2007). As the death penalty is not beyond the statutory maximum for Moffett's crimes, reliance on *Apprendi* and *Ring* is misplaced. *Bennett*, 933 So. 2d at 955.

¶146. Moffett argues that insufficient evidence supports the jury's HAC finding, considering the requirement that each aggravating circumstance be proven beyond a reasonable doubt. *See White v. State*, 532 So. 2d 1207, 1220 (Miss. 1988) (citing *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791, 61 L. Ed. 2d 560 (1979)). When this Court considers sufficiency of

41

evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ***Roche v. State***, 913 So. 2d 306, 314 (Miss. 2005) (quoting ***Jackson***, 443 U.S. at 315, 99 S. Ct. 2781). The jury heard testimony regarding Felicia's atrocious injuries and the abhorrent manner of her death.

¶147. This Court has held repeatedly that similar instructions meet constitutional standards, as they "narrow[] the aggravating circumstance of 'heinous, atrocious or cruel' and thereby channel[] the jury's sentencing discretion in a principled way." ***Bennett***, 933 So. 2d at 955-56 (quoting ***McGilberry v. State***, 843 So. 2d 21, 28 (Miss. 2003)) (citing seven cases with the "exact narrowing instruction").

¶148. Felonious child abuse is an underlying felony, as well as an aggravator, in Mississippi's capital-sentencing scheme. *See* Miss. Code Ann. §§ 99-3-19(2)(f), 99-19-101(5)(d) (Rev. 2007). Felonious child abuse and the HAC aggravator have distinct elements. *See* Miss. Code Ann. §§ 97-5-39(2)(a) (Rev. 2006), 99-19-101(5)(h) (Rev. 2007); ***Bennett***, 933 So. 2d at 954. We have affirmed cases in which both felonious child abuse and HAC have been found by a jury. ***Id.*** (citing ***Stevens v. State***, 806 So. 2d 1031, 1045, 1060 (Miss. 2001); ***Brown v. State***, 798 So. 2d 481, 501-03 (Miss. 2001)).

¶149. This Court has held many times "that evidence of an underlying crime can properly be used both to elevate the crime to capital murder and as an aggravating circumstance." *See **Ross***, 954 So. 2d at 1014 (citing five cases). The United States Supreme Court has held that use of an underlying felony as an aggravator is not a constitutional error. *See **Tuilaepa v. California***, 512 U.S. 967, 971-72, 114 S. Ct. 2630, 2634-35, 129 L. Ed. 2d 750 (1994); ***Lowenfield v. Phelps***, 484 U.S. 231, 233, 108 S. Ct. 546, 548, 98 L. Ed. 2d 568 (1988).

¶150. Moffett's arguments are without merit. We find that he is due no relief on this assignment of error.

***Moffett***, 49 So. 3d at 1115-16.

¶83.    Moffett is now attempting to relitigate the submission of the heinous, atrocious, and cruel aggravator, an issue that is barred by the doctrine of *res judicata,* only this time under

42

the guise of ineffective assistance of counsel. The State argues that Moffett's claims are meritless, because this Court already has determined on direct appeal that the aggravator in question was properly submitted to the jury and the "jury heard testimony regarding Felicia's atrocious injuries and the abhorrent manner of her death." *Id.* at 1115. Further, this Court held that the jury was properly instructed on this issue.

¶84.    *Res judicata* notwithstanding, Rule 704 of the Mississippi Rules of Evidence provides: "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." The "Comment" to Rule 704, however, states that "[t]he abolition of the ultimate issue rule does not result in the admission of all opinions. It is an absolute requirement under Rules 701 and 702 that opinions must be helpful to a determination of the case before they are admissible." M.R.E. 704 cmt.

> Every expert opinion embracing the ultimate fact is not per se admissible, however. The opinion still must be helpful to the trier of fact. "*Questions which simply allow the witness to tell the jury what result to reach are impermissible, as are questions asking the witness for a legal conclusion.*" "[T]he task of separating impermissible questions which call for overbroad or legal responses from permissible questions is not a facile one."
>
> . . . .
>
> *[A]n opinion which covers facts within the common knowledge or experience of lay people will not be helpful and therefore [is] inadmissible.* (citations omitted) (emphasis supplied).

*Hart v. State,* 637 So. 2d 1329, 1339 (Miss. 1994) (emphasis in original) (quoting *May v. State*, 524 So. 2d 957, 964 (Miss.1988)).

43

¶85. Outside the presence of the jury, the prosecution asked the State's medical expert if he would consider the injuries suffered by Felicia to be heinous, atrocious, and cruel. He was beginning to answer when counsel for the defense objected, stating that that was a determination for the jury. The prosecution responded that the jury was not present. The trial court, however, overruled the objection, stating that the medical expert was a forensic pathologist.

¶86. During the sentencing phase of trial, the medical expert was called to the stand and, again, asked if the injuries suffered by Felicia were heinous, cruel and atrocious. When asked if Felicia's injury was heinous, he responded that it was "despicable." When asked if it was cruel, he responded "if you define cruel in part as painful, I would. If it's wanton – [.]" When asked if it was atrocious, he responded, "If it's wanton, without remorse, yes, I would define it as that." He was asked again if he would consider Felicia's injury atrocious and he responded affirmatively.

¶87. On cross-examination, the prosecution showed Aiken a photo of Felicia Griffin and asked him if it was heinous. He responded, "For any human being to say it's not, something is very wrong." When asked if it was cruel, he responded, "Obviously." And when asked if it was atrocious, Aiken said, "Very much so."

¶88. With both witnesses, in the presence of the jury, this line of questioning drew no objections from the defense. One easily could conclude that it was strategic to abstain from objecting. First, objecting chances that the jury would give greater weight to the testimony. Second, given the evidence presented, the defense risks losing credibility with the jury.

44

Finally, the trial court already had overruled a similar objection made outside the presence of the jury. Accordingly, it cannot be said that counsel's performance was deficient, and Moffett's claim does not overcome the standard set forth in **Strickland**. Additionally, this Court already has heard and determined on direct appeal that the jury was presented evidence to support the aggravator and that the jury was properly instructed. **Moffett**, 49 So. 3d at 1115-16. For the forgoing reasons, it cannot be said that appellate counsel was ineffective for failing to assert that the testimony amounted to plain error on direct appeal.

**6.      Failure to renew motion for "cooling-off" period between the trial and sentencing phases**

¶89.    On direct appeal, Moffett's sixteenth issue brought into question whether the trial court erred by proceeding to the sentencing phase of the trial immediately after the jury returned a guilty verdict. In its analysis, this Court pointed out that Moffett submitted a pretrial motion requesting a twenty-four-hour cooling-off period before beginning the sentencing phase. The trial court deferred a decision until trial, stating "The Court will just make the best judgment it can based upon the existing status of the trial." This Court also pointed out that "Moffett did not object to proceeding, renew his motion for a cooling-off period, seek a recess or continuance, move to make an inquiry of the jury, or report to the trial judge that either he or his attorneys were too tired or otherwise not ready to proceed" following return of the guilty verdict. **Moffett**, 49 So. 3d at 1112. The Court ultimately held that the trial court did not err, and it "was within its broad discretion to proceed without

45

complaint or objection of the parties, their counsel, or the jury." *Id.* at 1114. The issue has been analyzed and rejected by this Court, and it is barred by the doctrine of *res judicata*.

¶90.    Moffett now asserts that de Gruy and Duggan were ineffective for failing to renew the motion for a cooling-off period. The lack of an objection by defense counsel was but one factor in denying relief on this issue on direct appeal. The merits also were discussed. *Res judicata* notwithstanding, Moffett must demonstrate to this Court that his counsel's performance was deficient and that the deficiency prejudiced his defense. *Strickland*, 466 U.S. at 687. As evidence of this claim for ineffective assistance of counsel, Moffett offers the affidavits of his trial counsel.

¶91.    Even assuming, for the sake of argument, that Moffett's counsel were deficient for failing to recall the motion for a cooling-off period or request a recess, the affidavits do not point to any specific error or prejudicial conduct that arose from that deficient performance. Moffett also fails to point out how he was prejudiced by such a failure. An assertion that the jury's decision to impose the death penalty resulted from voting in the heat of passion or from being exhausted by late-night deliberations, without more, is mere speculation. There is nothing in the record that indicates Moffett's counsel, the jury, or the court had any difficulties continuing with the proceedings.

¶92.    Further, he has failed to carry his burden and show that the trial court would have granted a cooling-off period if the request had been renewed. There is no mandatory statutory cooling-off period between the guilt and sentencing phases of trial in this state. Mississippi Code Section 99-19-101(1) states, in part:

46

> Upon conviction or adjudication of guilt of a defendant of capital murder or other capital offense, the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death, life imprisonment without eligibility for parole, or life imprisonment. The proceeding shall be conducted by the trial judge before the trial jury *as soon as practicable*.

Miss. Code Ann. § 99-19-101(1) (Rev. 2007) (emphasis added). Further still, this Court has found no error where a jury has had as little as fifteen minutes between the guilt and sentencing phases of trial. *See* ***McGilberry v. State,*** 741 So. 2d 894, 919 (Miss. 1999); ***Conley v. State***, 790 So. 2d 773, 799 (Miss. 2001) (In light of ***McGilberry,*** denial of twelve-hour cooling-off period upheld where at least thirty minutes to two hours and thirty minutes lapsed between the guilt and sentencing phases of a capital-murder trial.) Moffett has failed to meet either prong of ***Strickland***, and the application for leave should be denied on this issue.

### 7. Failure to object to testimony of family members regarding opinion of appropriate sentence for Moffett

¶93. Moffett contends that his trial counsel was ineffective for failing to object to statements made by the victim's family regarding the appropriate sentence they felt Moffett deserved. In its response, the State correctly points out that this Court considered and rejected the underlying issue of victim-impact statements on direct appeal. ***Moffett v. State***, 49 So. 3d 1073, 1105-08 (Miss. 2010) ("Notwithstanding the waiver, we find no evidence that the jury was affected by passion or prejudice as a result of this limited testimony.").

¶94. This Court will not consider an ineffective-assistance-of-counsel claim when the underlying issue was considered on direct appeal and found to be without merit. ***Spicer v.***

47

*State*, 973 So. 2d 184, 197 (Miss. 2007). "The doctrine of *res judicata* shall apply to all issues, both factual and legal, decided at trial and on direct appeal." Miss. Code Ann. § 99-39-21(3) (Rev. 2007). The underlying issue here is barred and shall not be considered again under the guise of ineffective assistance of counsel. *Foster v. State*, 687 So. 2d 1124, 1229 (Miss. 1996).

> **8. Failure to object to portions of the prosecution's closing arguments during the sentencing phase**

¶95. Although attorneys are not allowed to use unfair means when arguing to a jury, they are permitted broad latitude.

> There is no distinction between the latitude given by this Court with regard to closing arguments during the sentencing phase as compared to the guilt phase. *Wells v. State*, 903 So. 2d 739, 742-43 (Miss. 2005). Attorneys are afforded a wide latitude in arguing their case to the jury, but they are not allowed to employ tactics which are inflammatory, highly prejudicial, or reasonably calculated to unduly influence the jury. *Sheppard v. State*, 777 So. 2d at 661. This Court will reverse a conviction because of lawyer misconduct if it concludes that the natural and probable effect of the improper argument was to create unjust prejudice against the accused and was likely to result in a decision influenced by the prejudice so created. *Id*. Furthermore, alleged improper prosecutorial comment must be considered in context with the circumstances of the case. *Ahmad v. State*, 603 So. 2d 843, 846 (Miss. 1992). In this case, the Court must review the prosecutor's comments in conjunction with the "opening salvo" from defense counsel. *Edwards v. State*, 737 So. 2d 275, 299 (Miss. 1999).

*Spicer v. State*, 973 So. 2d 184, 203 (Miss. 2007).

¶96. As with Moffett's first issue discussed above, he continues to assert ineffective assistance of counsel for failing to object to certain arguments made by the State during the sentencing phase. Similar arguments made by the prosecution during the guilt phase of trial,

48

discussed *supra*, were made again at sentencing. For the same reasons, this issue is without merit.

### (a) Biblical references by the prosecution

¶97. Moffett expands his argument in this claim by challenging the prosecution's biblical references. In ***Manning v. State***, 929 So. 2d 885 (Miss. 2006), however, this Court held:

> [W]e find this claim has no merit because this Court has found Biblical or scriptural references in closing arguments to be within the broad latitude afforded at trial.
>
>> This Court has continually held that counsel is afforded broad latitude in closing argument. This latitude, set out by the Court in ***Nelms & Blum Co. v. Fink***, 159 Miss. 372, 382-383, 131 So. 817, 820 (1930), has been referred to in the context of capital cases. In ***Nelms***, we stated that "[c]ounsel may draw upon literature, history, science, religion, and philosophy for material for his argument." *Id*. at 382-384, 131 So. 817. *See* ***Hansen v. State***, 592 So. 2d 114, 139-140 (Miss. 1991) [other citations omitted].
>
> ***Berry v. State***, 703 So. 2d 269, 281 (Miss. 1997) (quoting ***Carr v. State***, 655 So. 2d 824, 853 (Miss. 1995)). Considering the merits of this issue, Manning fails to demonstrate prejudice regarding the State's scriptural references or parole argument during closing argument of the sentencing phase of Manning's trial. We thus find this issue to be without merit.

*Id.* at 906. Having reviewed the biblical references Moffett complains of, they are within what this Court has approved. Therefore, Moffett cannot show that his counsel was ineffective for failing to object to the prosecutor's closing arguments on this matter.

### (b) Comparing the plight of the victim with the life of the defendant

¶98.    Moffett also claims that his counsel was ineffective for failing to object when the prosecution compared the plight of the victim to the life of Moffett during the sentencing-phase closing arguments.  Specifically, Moffett takes issue with Mansell's closing argument wherein she stated:

> Did he – and they, well, please show him mercy.  Did he show this girl mercy. If you think -- if you can go back there and say, you know what, he showed her some mercy, then show him mercy and give him a life sentence.
>
> They want to say, oh, life imprisonment is so bad.  I am sure Pennie Griffin would appreciate it if her daughter was still here and incarcerated, she would probably appreciate the fact that she could at least go visit her daughter.  You know where she gets to go, to a grave that doesn't even have a tombstone. That's where she gets to go to.

¶99.    Moffett asserts that it was improper argument to compare the plight of the victim with the life of the defendant in prison.  Moffett relies on opinions from other jurisdictions, citing no authority from this Court.  Moffett also asserts that it was impermissible to ask the jury to show the same amount of mercy toward Moffett as he showed his victim.  Again, he cites no controlling authority. Further, just minutes before the prosecutor's remarks, Moffett asked the jury for mercy.

¶100.  In *Spicer*, defense counsel begged the jury to have mercy on the defendant. The prosecution responded in turn as follows:

> He is either going to die in prison, which is a death penalty, and the State is going to support him [for] the next 50 years until he dies, with our tax dollars, or he will die sooner.  Either way, it's a death penalty.  And I submit to you, why should he be allowed to sit for the next 50 years and watch TV and have friendships and to have associations and to have hope and to have all the things that living people have when [the victim] is dead?

50

*Spicer*, 973 So. 2d at 203. Spicer argued that his counsel was ineffective for failing to object to the prosecutor's comments. Finding no merit to his claim, this Court held:

> Even if we were to assume, for the sake of argument, that counsel was ineffective for failing to object to the State's comment, the natural and probable effect of the argument by the prosecution was not to create an unjust prejudice against Spicer resulting in a decision influenced by that prejudice.

*Id.* The prosecutor's comments were in response to Moffett's plea for mercy, and the comparison of the victim's plight with Moffett's life was no different than the comments made by the prosecutor in *Spicer*, with which this Court did not find error. Therefore, Moffett has not shown that his counsel was ineffective for failing to object to the prosecutor's closing arguments on this matter.

### (c) Emotional appeals based on the prosecutor's circumstances

¶101. Moffett complains of references Mansell made to the jury, regarding her own daughter, which Moffett claims was an impermissible argument on the golden rule. Mansell stated:

> I know y'all have heard I just had a baby four months ago, a little baby girl. And you know what I have had to face since I've been at home with her on maternity leave[?] Knowing I had to come and try this case with that man.
>
> And every time I changed my baby's diaper, you know what I looked at[?] Her vagina. And I thought to myself, how in the world could somebody do that to a baby girl. How is that possible that someone is that -- something wrong with them to the point that they get pleasure -- and we know he got pleasure out of it[?] He masturbated. He got pleasure out of doing this to a little girl.

¶102. In support of this contention, Moffett relies on *Wells v. State*, 698 So. 2d 497 (Miss. 1997), wherein the following dialogue occurred:

51

[BY Prosecutor:] You know, this case hits kind of close to home to me. I've got a thirteen year old. Got another one that's not much older than that.

BY [Defense Counsel]: I am going to object to that form of argument.

BY THE COURT: Overruled.

BY [Defense Counsel]: It is certainly improper.

BY THE COURT: Objection overruled.

BY [Prosecutor]: I can't imagine a set of circumstances when somebody could come into my house while my child is sitting on the couch watching television or asleep, stab them seventeen times–

BY [Defense Counsel]: Your Honor, could I have a continuing objection to that line of argument?

BY THE COURT: Yes, you have an objection, which is overruled.

BY [Prosecutor]: Leave him on the floor to bleed to death, and then throw him in a shallow grave, and call that self-defense. I couldn't call that anything but capital murder, and I would venture to say that *if it was your child, you couldn't call it anything else either.*

BY [Defense Counsel]: Your Honor, that is obviously improper, prejudicial. The District Attorney well knows it. We object to it.

BY THE COURT: Overruled.

BY [Prosecutor]: If you and I–

BY [Second Defense Counsel]: Your Honor, we would like to move for a mistrial, also, based on that.

BY THE COURT: Motion is overruled.

BY [Prosecutor]: If you and I expect the law to protect our children or anybody else's children, then it has got to stand up for Gary Wells, too . . . .

*Id.* at 506-07 (emphasis added).

¶103. The *Wells* Court stated: "Where a prosecutor has made an improper argument, the question on appeal is 'whether the natural and probable effect of the improper argument of the prosecuting attorney is to create an unjust prejudice against the accused as to result in a decision influenced by the prejudice so created.'" *Id.* at 507 (quoting *Davis v. State*, 530 So. 2d 694, 701 (Miss. 1988)). The Court then held that the jury's verdict likely was not influenced by any prejudice that might have resulted from the district attorney's isolated "golden rule" argument in light of the overwhelming evidence against Wells. *Id.*

¶104. Mansell's comments are distinguishable from *Wells*, as they were not a "golden rule" argument. She did not "ask[] the jurors to put themselves in the place of one of the parties. . . ." *Chisolm v. State*, 529 So. 2d 635, 639-40 (Miss. 1988). Further, given this Court's holding in *Wells* on this issue, even if we were to assume for the sake of argument that Mansell's comments were prejudicial, they pale in comparison to those made by the prosecutor in *Wells,* and they were harmless in the overall context of the case. Therefore, Moffett cannot show that his counsel were ineffective for failing to object to the prosecutor's closing arguments on this matter.

### (d)     Injecting racial bias into the proceedings with no evidentiary basis

¶105. This issue was discussed in Moffett's claim 2(d) as it pertained to closing arguments during the guilt phase. Moffett admits in his brief that the prosecutor's remarks were not repeated during the sentencing phase but he felt "it bears repeating" here. It may bear repeating that the prosecution is permitted to draw inferences from the evidence in closing

53

arguments. There was testimony from Donald Davis that Moffett had told him Felicia was mocked by other children because she was of mixed race and Moffett "relieved her of her pain." Therefore, Moffett cannot show that his counsel was ineffective for failing to object to the prosecutor's closing arguments on this matter. Moffett has failed to offer any evidence that racial bias infected these proceedings. There is no merit to this claim.

## Appellate Counsel

### 9. Failure to raise issues of plain error on direct appeal

¶106. In this claim, Moffett asserts that his appellate counsel was ineffective for failing to raise the underlying claims in issues 3, 4, 7, and 8 discussed[6] above on direct appeal. It is important to note that one of Moffett's trial counsel and appellate counsel were the same. "[I]t is absurd to fantasize that [a] lawyer might effectively or ethically litigate the issue of his own ineffectiveness." *Pitchford v. State*, 45 So. 3d 216, 232 (Miss. 2010) (quoting *Lynch v. State*, 951 So. 2d 549, 551-52 (Miss. 2007); *Read v. State*, 430 So. 2d 832, 838 (Miss. 1983)).

¶107. Rule 22(b) of the Mississippi Rules of Appellate Procedure provides:

> Issues which may be raised in post-conviction proceedings may also be raised on direct appeal if such issues are based on facts fully apparent from the record. Where the appellant is represented by counsel who did not represent the appellant at trial, the failure to raise such issues on direct appeal shall constitute a waiver barring consideration of the issues in post-conviction proceedings.

---

[6] This issue appears in Moffett's PCR as his fifth issue, claiming that the underlying claims raised in his issues 1-4 should have been raised as plain error.

M.R.A.P. 22(b). Because de Gruy represented Moffett at trial and on appeal, the issues Moffett now raises, though meritless, have not been waived.

¶108. Moffett contends that the alleged improper prosecutorial arguments set forth above should have been raised as plain error by his counsel on direct appeal. He further asserts that the failure to do so was ineffective assistance of appellate counsel.

¶109. As previously shown, there was no objection to the alleged errors. Therefore, if error is found, it must be plain error. However, "[this Court do]es not recognize plain error unless the error resulted in a manifest miscarriage of justice." *Burdette v. State*, 110 So. 3d 296, 304-05 (Miss. 2013) (quoting *Conners v. State*, 92 So. 3d 676, 684 (Miss. 2012)) (internal quotations omitted). Prejudice often is lacking when the weight of the evidence against a defendant is overwhelming. *Conners*, 92 So. 3d at 684. (*see also Smith v. State*, 986 So. 2d 290, 300-01 (Miss. 2008); *Clark v. State*, 891 So. 2d 136, 141 (Miss. 2004)). Given the overwhelming evidence of Moffett's guilt, there has been no miscarriage of justice even if this Court were resolved to find that error had occurred.

¶110. In regard to the ineffective-assistance-of-counsel assertion attached with this claim, the earlier discussion of these issues reveals that no error occurred. Thus, counsel was not deficient, and efforts on direct appeal to persuade this Court that the underlying claims amounted to plain error would have been futile. Moffett fails on both prongs of *Strickland*.

### 10. Cumulative Error

¶111. Moffett argues that he was denied a fair trial due to the cumulative errors of his trial counsel. He further argues that the cumulative errors, in general, denied him a fair trial. A

criminal defendant is not entitled to a perfect trial, only a fair trial. *McGilberry v. State*, 843 So. 2d 21, 33 (Miss. 2003) (citing *Sand v. State*, 467 So. 2d 907, 911 (Miss. 1985)). Moffett failed to support his contention that he did not receive a fair trial.

¶112. "This Court may reverse a conviction and/or sentence based upon the cumulative effect of errors that do not independently require a reversal. It is true that in capital cases, although no error, standing alone, requires reversal, the aggregate effect of various errors may create an atmosphere of bias, passion and prejudice that they effectively deny the defendant a fundamentally fair trial." *Wilcher v. State*, 863 So. 2d 776, 836-37 (Miss. 2003) (internal quotations and citations omitted). After a comprehensive review of the record, the briefs, and the arguments, we find no individual errors which require reversal, and there is no aggregate collection of minor errors that would, as a whole, mandate a reversal of either the conviction or the sentence. Thus, this issue is without merit.

## CONCLUSION

¶113. We deny all relief requested in Moffett's Motion, Amended Motion for Leave to Proceed in the Trial Court with a Petition for Post-Conviction Relief and his supplement thereto.

¶114. **PETITION FOR POST-CONVICTION RELIEF IS DENIED**.

**WALLER, C.J., LAMAR, KITCHENS, CHANDLER, PIERCE, KING AND COLEMAN, JJ., CONCUR. DICKINSON, P.J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**