# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2018-DR-00276-SCT

*ERIC MOFFETT*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/24/2014 |
| TRIAL JUDGE: | HON. W. SWAN YERGER |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT FIRST JUDICIAL DISTRICT |
| ATTORNEYS FOR PETITIONER: | OFFICE OF CAPITAL POST-CONVICTION COUNSEL BY:  KRISSY CASEY NOBILE      ELIZABETH ANNE FRANKLIN-BEST |
| ATTORNEYS FOR RESPONDENT: | OFFICE OF THE ATTORNEY GENERAL BY:  LADONNA C. HOLLAND      ALLISON KAY HARTMAN      BRAD ALAN SMITH |
| NATURE OF THE CASE: | CIVIL - DEATH PENALTY - POST CONVICTION |
| DISPOSITION: | LEAVE TO FILE SUCCESSIVE PETITION FOR POST-CONVICTION RELIEF DENIED - 10/13/2022 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**RANDOLPH, CHIEF JUSTICE, FOR THE COURT:**

¶1.     Eric Moffett filed a motion for leave to file successive petition for post-conviction relief (PCR) from his capital murder conviction and sentence of death.

¶2.     Moffett was convicted of a savage sexual assault on a five-year-old girl, culminating in her death.  Compelling evidence supported his conviction including, *inter alia*, conclusive

DNA evidence, eyewitness testimony, and a confession. The jury determined that the victim's murder was: (1) committed while Moffett was engaged in felonious abuse and/or battery of a child and (2) especially heinous, atrocious, or cruel. On February 25, 2006, the jury sentenced Moffett to death.

¶3. Moffett's conviction and sentence were affirmed by this Court on direct appeal, and his motion for rehearing was subsequently denied. *Moffett v. State*, 49 So. 3d 1073 (Miss. 2010). Moffett sought relief in the United States Supreme Court by way of a petition for writ of certiorari, which was denied on October 3, 2011. *Moffett v. Mississippi*, 565 U.S. 830, 132 S. Ct. 127, 181 L. Ed. 2d 49 (2011).

¶4. Moffett's first PCR was primarily encapsulated within ineffective assistance of counsel claims categorized into three parts: (1) ineffective assistance of André de Gruy and Dan W. Duggan, Jr., trial counsel; (2) ineffective assistance of de Gruy and Allison R. Steiner, appellate counsel; and (3) cumulative error. Finding no merit in any of Moffett's claims, the Court denied his PCR, as supplemented. *Moffett v. State*, 156 So. 3d 835 (Miss. 2014), *reh'g denied*, July 31, 2014.

¶5. Moffett filed a petition for habeas corpus in the United States District Court for the Southern District of Mississippi, Northern Division, on May 27, 2015.[1] Nearly two years later, on March 17, 2017, Moffett moved for a stay of his federal habeas proceedings to allow him to exhaust state remedies and raise additional claims he now presents to the Court in his motion for leave to file successive petition for PCR. More than two years after the case was

---

[1] *Moffett v. Hood*, No. 3:14 CV639-CWR.

2

pending in the federal court, the federal court granted a stay on September 12, 2017.

¶6.     Inexplicably, Moffett delayed nearly four years before filing this motion for leave to file successive petition for PCR on July 6, 2021.  In the instant filing, Moffett raises two issues.   Those claims are subject to three bars.  They are untimely and successive.  Miss. Code Ann. §§ 99-39-5(2), -27(9) (Rev. 2020).  They are also barred by the doctrine of res judicata. Miss. Code Ann. 99-39-21(3) (Rev. 2020).  Notwithstanding these procedural bars, the untimely claims lack a substantial showing of the denial of any state or federal right. Moffett's motion for leave is denied.

**FACTS**

¶7.     The following factual and procedural background are gleaned from this Court's opinion on direct appeal:

> Felicia Griffin was sexually abused, [FN1] battered, [FN2] and murdered during the early morning hours of December 31, 1994. Felicia lived in Jackson with her two sisters; mother, Pennie Griffin; and, Pennie's boyfriend, Moffett. On December 30, 1994, Moffett, Pennie, and the three girls were at home. Moffett left the house at approximately 9:45 p.m. while Pennie was preparing to go to work. Pennie expected Moffett's mother, Florence Moffett Powell, to arrive soon to take her to work. When Powell did not timely arrive, Pennie went to a nearby gas station to phone her employer and Powell. Pennie checked on the children before leaving, and locked the door and burglar bars as she departed. After going by Pennie's home, Powell picked up Pennie at the gas station and proceeded to take Pennie to work. It was disputed at trial whether Powell was alone when she arrived at the gas station, or whether she was accompanied by her daughter, Sheritha Moffett. Sheritha testified that she had accompanied Powell and had observed Powell enter the house looking for Pennie. Powell did not testify, as she died before trial. The jury heard evidence that Moffett returned to the house a few hours later, took Felicia into the bedroom he shared with Felicia's mother, abused Felicia, and savagely raped her with his fingers and fist.
>
> FN1. The perineum had been savagely ripped or torn, resulting in open

3

communication of the excretory opening of the alimentary canal with her genital orifice.

FN2. She had bruises on her neck, face, and left leg; and petechial hemorrhages on her face.

Moffett reported Felicia's death via a 911 call and awaited the arrival of officers from the Jackson Police Department (JPD). After the police officers arrived, Moffett exhibited anger and began to behave strangely. His behavior escalated to the point that he was "out of control" and "throwing furniture," according to the testimony of police officers. Four officers subdued Moffett. He was handcuffed and arrested. From his arrest on December 31, 1994, Moffett remained incarcerated until September 7, 1995, when a grand jury returned no true bill. Moffett was released the same day. He had been in custody 250 days.

Years later, a JPD cold-case unit reviewed the file and submitted its findings to the district attorney. Moffett was indicted in April 2002. Moffett was tried, convicted, and received a death sentence in February 2006. Substantial evidence was presented at trial, including the live testimony of numerous witnesses. Witnesses included, but were not limited to, Pennie Griffin; LaQuandia Griffin, the victim's sister; Donald Davis, a prison inmate; Mary Esther Pearson, a nurse practitioner; Huma Nasir, a forensic DNA analyst for a private DNA laboratory; and Detective Rod Eriksen, a JPD officer.

LaQuandia testified that she was seven years old at the time of the murder. The night of the crime, Pennie helped her and her sisters, Jessica and Felicia, get ready for bed and checked on them before she left for work. The three girls were sleeping on a pallet in a room across the hall from the bedroom shared by Pennie and Moffett. Lights were on in the girls' bedroom, the hallway, and bathroom. LaQuandia woke up and saw Moffett standing in the doorway of the girls' bedroom. She saw Moffett pick up Felicia, who was sleeping closest to the door. He took Felicia to his bedroom. He did not close the doors all the way, so she could see him. He placed Felicia down on the bed and started touching and rubbing on her chest and stomach areas. She heard Felicia making "all kind of painful cries." She then dozed off, only to be awoken later. She saw someone [FN3] in the hallway going into Pennie's bedroom. She remembered looking into the bedroom and seeing Felicia "laying in the bed and the covers were real bloody." After the police arrived, Moffett approached her, hugging and attempting to reassure her. She recalled seeing Moffett "throw a fit, . . . he was . . . yelling and screaming, . . . picking

4

up chairs and . . . throwing things as if he cared." She saw the paramedics take Felicia away on a stretcher. She was not sure what she told the policeman who questioned her about the murder, but she did recall being afraid to tell him about Moffett, as he was still in the house at the time.

FN3. This person was later determined to have been a paramedic.

Donald Davis, an inmate with Moffett during the 1994–95 confinement, testified. During his testimony, he read a statement he had written on September 15, 1995, [FN4] when he was interviewed by a JPD officer at the Hinds County Detention Center. Moffett had confessed the crime to Donald Davis at a Bible study on September 3, 1995. The confession had included graphic details of the crime and Moffett's attempt to seek forgiveness by inflicting injury upon himself (smashing his hand in a steel door at the detention center).

FN4. This was after the no-bill report of the September 1995 grand jury.

Mary Esther Pearson testified that she was a nurse practitioner who provided medical services to inmates at the detention center where Moffett was incarcerated. She testified that she treated Moffett in March 1995 for an injury to the middle and [fourth] fingers of his right hand. Moffett told her he had "mashed [his fingers] in a door."

Huma Nasir testified about DNA tests performed on laboratory samples taken at the emergency room, at autopsy, and at the murder scene, as well as known samples drawn from Moffett. She stated that the vaginal swab, vaginal wash, and anal swab were all positive for semen on the presumptive test, but were negative for sperm cells on the confirmatory test, indicating that there were no "physical sperm cells" remaining in the semen samples. She testified at length about DNA tests done on cuttings from the bath towel found in the bed where Felicia had been found by paramedics. The towel was positive for semen and epithelial cells, but was negative for blood. There were two stains on the towel. The first was a semen stain and the other was a mixed stain, including semen and epithelial cells. [FN5] The semen stain was found to match Moffett's DNA on all fifteen markers. Nasir testified that there was less than one chance in five trillion, nine hundred billion (5,900,000,000,000) [FN6] that the semen had come from anyone other than Moffett. As for the mixed stain, neither Moffett nor Felicia could be excluded as the source of the two sets of DNA found there. There were matches on four foci and six alleles, which Nasir described as "weak" alleles. She stated that, from this evidence, more than 99.9% of the population could be excluded as possible donors of the

5

two components, thus, there was less than one chance in a thousand that anyone else contributed to the mixed stain.

> FN5. Epithelial cells include mucous, saliva, vaginal secretions, and skin, but not semen. Blood normally would be included in the epithelial portion, but not here, as the towel was found to be negative for blood.

> FN6. This is more than nine hundred times the estimated population of the entire world in 2006. Population Reference Bureau, 2006 World Population Fact Sheet 5 (chart), *http://www.prb.org/pdf 06/06 world data sheet. pdf* (last visited September 4, 2010).

Pennie testified that, on the morning of December 30, 1994, she and Moffett had an argument and that he hit her "upside the head." She stated that, at that point, she decided to end the relationship with Moffett and that she wrote him a letter telling him that it was over. Police Lieutenant Rod Eriksen testified that the letter, which he saw as establishing a possible motive, was found in the bedroom where Felicia was found. The jury viewed a videotape, taken as Eriksen and the crime-scene investigator carried out their investigation of the scene. The jury saw, inter alia, Eriksen discovering the letter at the scene.

Several other witnesses testified, including, but not limited to, an emergency room physician; an emergency medical technician; JPD officers, including detectives and crime scene investigators; and pathologists.

*Moffett*, 49 So. 3d at 1077-79 (some alterations in original). Additional facts are provided when relevant to the discussion of each issue.

## ISSUES

I. **Whether trial counsel rendered ineffective assistance of counsel by failing to either call their retained DNA expert, John Wages, to the stand, or use him to assist defense counsel in challenging the State's DNA evidence.**

II. **Whether trial counsel rendered ineffective assistance of counsel by failing to present evidence of Moffett's cognitive impairments caused by childhood exposure to lead.**

### Discussion of Matters Concerning Both Issues

6

¶8. The State argues that the issues raised in the successive PCR are procedurally barred. Leave to proceed should be granted only if Moffett's petition, exhibits, and the prior record show that his claims are not procedurally barred and that they "present a substantial showing of the denial of a state or federal right." Miss. Code Ann. § 99-39-27(5) (Rev. 2020); *see also Grayson v. State*, 118 So. 3d 118, 125 (Miss. 2013). "Direct appeal [is] the principal means of reviewing all criminal convictions and sentences. . . ." Miss. Code Ann. § 99-39-3(2) (Rev. 2020). Review under the Mississippi Uniform Post-Conviction Collateral Relief Act, with some exceptions, is limited to issues that could not or should not have been reviewed at trial and in the direct appeal. *Brown v. State*, 798 So. 2d 481, 491 (Miss. 2001). "The dismissal or denial of an application under this section is a final judgment and shall be a bar to a second or successive application under this article." Miss. Code Ann. § 99-39-27(9) (Rev. 2020). "The procedural bars of waiver, different theories, and res judicata as well as the exceptions thereto contained in Miss. Code Ann. § 99-39-21(1)-(5) are clearly applicable to death penalty post-conviction relief applications. [Moffett] carries the burden of demonstrating that his claim[s are] not procedurally barred. Miss. Code Ann. § 99-39-21(6)." *Powers v. State*, 945 So. 2d 386, 395 (Miss. 2006). "No relief shall be granted under this article unless the petitioner proves by a preponderance of the evidence that he is entitled to the relief." Miss. Code Ann. § 99-39-23(7) (Rev. 2020).

¶9. Moffett's present claims repeat allegations of ineffective assistance from his trial counsel. These claims were capable of being raised in Moffett's first PCR. "[T]his Court has recognized that PCR proceedings are a critical stage of the death-penalty appeal process

7

at the state level[.]" ***Grayson***, 118 So. 3d at 126 (citing ***Jackson v. State***, 732 So. 2d 187, 191 (Miss. 1999); ***Chamberlin v. State***, 55 So. 3d 1046, 1049 (Miss. 2010)). We have recognized that "PCR petitioners who are under a sentence of death do have a right to the effective assistance of PCR counsel." ***Id.*** But, Moffett now seeks to resurrect claims of ineffective assistance of trial counsel under the guise of ineffective assistance of PCR counsel.

¶10. In order for Moffett to overcome the successive-writ bar, he must demonstrate that his right to effective PCR counsel was violated such that his first PCR "was a sham," effectively denying him the "opportunity to present a meritorious PCR motion." ***Id.*** at 126. In Moffett's first PCR, he raised eight claims of ineffective assistance of trial counsel. One of the claims had six sub-parts and another had four sub-parts. He also asserted that appellate counsel was ineffective for failing to raise four of those eight claims on direct appeal. Moffett also claimed cumulative error. Moffett has failed to make a showing that his first PCR was a sham, denying him the opportunity to present a meritorious PCR. The issues raised in the instant PCR are without merit.

*Timeliness*

¶11. Statutorily, petitioners seeking relief under the Mississippi Uniform Post-Conviction Collateral Relief Act must file a petition

> within three (3) years after the time in which the petitioner's direct appeal is ruled upon by the Supreme Court of Mississippi or, in case no appeal is taken, within three (3) years after the time for taking an appeal from the judgment of conviction or sentence has expired, or in case of a guilty plea, within three (3) years after entry of the judgment of conviction.

Miss. Code Ann. § 99-39-5(2) (Rev. 2020). Petitioners such as Moffett, seeking relief in capital cases, must file "within one (1) year after conviction." Miss. Code Ann. § 99-39-5(2)(b) (Rev. 2020). Following the denial of post-conviction relief, a petitioner has one (1) year to file an application for writ of habeas corpus in federal court. *See* 28 U.S.C.A. § 2244(d)(1) (West, Westlaw through Pub. L. No. 117-177).

¶12.    Moffett's first PCR was denied on April 24, 2014, and rehearing was denied on July 31, 2014. The mandate issued on August 7, 2014. Following that final ruling, Moffett filed his federal habeas corpus petition on May 27, 2015. On March 17, 2017, nearly two years later, Moffett petitioned the federal court to stay the habeas proceedings so he could file a successive PCR in this Court. In the federal petition for a stay, Moffett specifically listed the issues now presented, evincing knowledge of those claims multiple years ago. The federal district court entered a stay order on September 12, 2017. Moffett delayed filing this petition for nearly four years. This petition was not filed until July 6, 2021, only after the federal court issued a May 2, 2021, show cause order requiring Moffett to explain "why this case should not be returned to the Court's active docket for failure to pursue the Petitioner's claims in state court."

¶13.    Defendants have an interest in having their meritorious claims advanced expeditiously, and "justice shall be administered without sale, denial or *delay*." Miss. Const. art. 3, § 24 (emphasis added). The citizens of our State and the victims of crimes *also* have an interest that "justice shall be administered without sale, denial or *delay*." *Id.* (emphasis added); *see also* Miss. Const art. 3, § 26A(1). Unnecessary and unjustified delays affect the

9

justice and fairness owed to victims and defendants alike. "Because our Constitution balances the rights of the accused with the rights of the victim, we- as guardians of the Constitution- can do no less." *Payton v. State*, 266 So. 3d 630, 641 (Miss. 2019).

¶14. The United States Supreme Court has recognized the importance of timely filings. Justice Kennedy, writing for the majority, held that "[b]oth the State and the victims of crime have an important interest in the timely enforcement of a sentence." *Hill v. McDonough*, 547 U.S. 573, 584; 126 S. Ct. 2096; 165 L. Ed. 2d 44 (2006) (citing *Calderon v. Thompson*, 523 U.S. 538, 556, 118 S. Ct. 1489, 140 L. Ed. 2d 728 (1998)). More recently, in *Bucklew v. Precythe*, 139 S. Ct. 1112, 1133-34, 203 L. Ed. 2d 521 (2019), the United States Supreme Court addressed delays when the interests of all involved had been frustrated for decades. Justice Gorsuch, writing for the Court, wrote:

> The [citizens of the state], the surviving victims of Mr. Bucklew's crimes, and others like them deserve better. . . . "[T]he long delays that now typically occur between the time an offender is sentenced to death and his execution" are "excessive." . . . The proper role of courts is to ensure that . . . challenges to lawfully issued sentences are resolved fairly and expeditiously. Courts should police carefully against attempts to use such challenges as tools to interpose unjustified delay. . . . [C]ourts "can and should" protect settled state judgments from "undue interference" by invoking their "equitable powers" to dismiss or curtail suits that are pursued in a "dilatory" fashion or based on "speculative" theories.

*Id.* at 1134 (citations omitted).

¶15. Not only did Moffett fail to file today's claims attacking his trial counsel's effectiveness within one year following his conviction, he failed to file them within one year after the federal district court issued the stay. Timely review of claims of ineffective assistance of PCR counsel is not be without boundaries. The State has an "interest in the

10

finality of conviction that have survived direct review within the state court system."
*Calderon*, 523 U.S. at 554 (internal quotation mark omitted) (quoting **Brecht v. Abrahamson**, 507 U.S. 619, 635, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993)).  And "[f]inality is essential to both the retributive and the deterrent functions of criminal law. 'Neither innocence nor just punishment can be vindicated until the final judgment is known.'" *Id.* (citation omitted).

¶16.   Moffett delayed nearly four years after being granted leave by the federal court to file this petition.  Such delays should not be tolerated.  Every wrongfully incarcerated petitioner with a meritorious claim would desire their meritorious claim be presented as quickly as possible to end their wrongful incarceration.  As a guide to timeliness, is it not reasonable to consider the Congress' and state legislators' pronouncements granting a one-year period following this Court's final ruling on a death penalty PCR?  The nearly four years delay in proceeding markedly exceeds that time period in today's case.

¶17.   Petitioner has had more than sufficient time within which to file any ineffective assistance of PCR counsel claims.[2]  Dilatory tactics should not impair courts from resolving cases fairly and expeditiously.  Dilatory tactics should not empower petitioners to frustrate the rights of surviving victims, citizens of the state, and settled judgments.  The petition is not only successive, it is untimely.

   *Ineffective Assistance of Trial Counsel*

¶18.   Because both claims presented in this motion for leave to file successive petition for

---

   [2]  This coincides with the Federal statute of limitations for filing federal habeas corpus proceedings.  *See* 28 U.S.C.A. § 2244(d)(1).

PCR center on the ineffective assistance of counsel, the standard to be applied to both claims is discussed here.

¶19.  "The benchmark for judging any claim of ineffectiveness [of counsel] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984).  In order for Moffett to prevail on such a claim, he must demonstrate to this Court that his trial counsels' performance was deficient and that the deficiency prejudiced the defense of the case. *Id.* at 687.  And "[u]nless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Stringer v. State*, 454 So. 2d 468, 477 (Miss. 1984) (citing *Strickland*, 466 U.S. at 687).

¶20.  "In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Id.* (citing *Strickland*, 466 U.S. at 688; *see also State v. Tokman*, 564 So. 2d 1339, 1343 (Miss. 1990)).

> Judicial scrutiny of counsel's performance must be highly deferential. (citation omitted) . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's

12

conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Stringer*[, 454 So. 2d] at 477; *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. Said differently, defense counsel is presumed competent. *Johnson v. State*, 476 So. 2d 1195, 1204 (Miss.1985); *Washington v. State*, 620 So. 2d 966 (Miss. 1993).

*Foster v. State*, 687 So. 2d 1124, 1130 (Miss.1996); *see also Grayson*, 118 So. 3d at 127.

¶21. Further, even if Moffett could prove that his trial counsels' performance was deficient, this Court must determine whether there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Mohr v. State*, 584 So. 2d 426, 430 (Miss. 1991) (internal quotation mark omitted) (quoting *Handley v. State*, 574 So. 2d 671, 683 (Miss. 1990), *superseded by statute as stated in Rowsey v. State*, 188 So. 3d 486 (Miss. 2015)). When reviewing a capital-murder case, the most important inquiry is "whether there is a reasonable probability that, absent the errors, the sentence– including an appellate court, to the extent it independently reweighs the evidence– would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. If Moffett's ineffective assistance of counsel claims fail on either of the *Strickland* prongs, his claims must fail. *Foster*, 687 So. 2d at 1129-30. "[S]urmounting *Strickland*'s high bar is never an easy task." *Cullen v. Pinholster*, 563 U.S. 170, 197, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011) (internal quotation marks omitted) (quoting *Harrington v. Richter*, 562 U.S. 86, 105, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011) (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371, 130 S. Ct. 1473, 176 L. Ed. 2d 284

13

(2010))).

**I. Whether trial counsel rendered ineffective assistance of counsel by failing to either call their retained DNA expert, John Wages, to the stand or use him to assist defense counsel in challenging the State's DNA evidence.**

¶22. At trial, the State's DNA expert, Dr. Nasir, testified that Felicia's vaginal swab, vaginal wash, and anal wash all tested positive for semen on the presumptive test but negative for sperm cells on the confirmatory test, "indicating that there were no 'physical sperm cells' remaining in the semen samples." *Moffett*, 49 So. 3d at 1078-79; *Moffett*, 156 So. 3d at 844. Moffett does not challenge these findings.

¶23. Moffett focuses instead on the DNA tests performed on cuttings taken from the bath towel found in the bed where paramedics found Felicia. As stated above, the towel was positive for semen and epithelial cells but was negative for blood. The towel contained a semen stain and a mixed stain, including semen and epithelial cells.

¶24. During its preparation for trial, Moffett's defense team consulted with John M. Wages, Jr., a scientist with Palmetto Consulting and Research. Wages prepared reports for the defense on November 15, 2005, and January 26, 2006. In the latter report, Wages summarized that "[t]he evidence for victim's DNA in this sample is weak." He also opined that there was no means to determine the age of the semen on the towel. Further, Wages noted in his report that:

> It seems clear that any identification of the victim DNA in this sample is a reach. The results do not exclude the victim, but neither are they strong enough to draw much of a conclusion at all. What would have been reported if only those 4 weakly detected alleles (and no suspect alleles) were found? According to F36.10.1.1.c, the sample would have been reported inconclusive, reanalyzed, or "interpreted with caution at the discretion of the analyst." These

14

guidelines betray the subjectivity of the test.

Moffett claims that his trial counsel were ineffective for failing to call "Wages to testify at trial to the weakness of the DNA evidence presented by the State." Moffett asserts that the DNA present on the towel was the "linchpin" that ties him and the victim together during the time of the crime and that the failure to call Wages was "highly prejudicial."

¶25. In response, the State argues that the record demonstrates defense counsels' preparedness on the topic and that it was strategic to use Wages's report to vigorously cross-examine Dr. Nasir rather than call Wages as a witness. On direct appeal, the Court twice noted "the overwhelming evidence of Moffett's guilt" in its analysis. *Moffett*, 49 So. 3d at 1100, 1116. And in Moffett's first PCR, the Court referenced the overwhelming proof of Moffett's guilt, including "eyewitness testimony, DNA evidence, and Moffett's confession," five different times throughout the opinion. *Moffett*, 156 So. 3d at 854, 857, 858, 870.

¶26. Wages's report reveals that defense counsel contacted him in October 2005 with three specific questions regarding the DNA evidence against Moffett: (1) whether there was a "scientific way to determine how long the semen was on the towel," (2) whether he could explain the meaning of a "weak allele" as described in Dr. Nasir's report, and (3) whether earlier testing of the vaginal swab would have "returned a result."[3]

¶27. Wages advised defense counsel as follows regarding Nasir's report of the mixed DNA profile found on the towel:

> The wording of ReliaGene's report needs to be carefully considered in

---

[3] Moffett's claim of ineffective assistance of counsel is directed primarily at counsel's failure to call Wages to address DNA evidence and the "weak allele[s]."

15

interpreting the data from the epithelial fraction of the towel. Here is what the lab report (2/10/05) says:

> DNA test results for the epithelial fraction of the towel . . . are consistent with a mixture of . . . victim Felicia Griffin and . . . suspect Eric Moffett. Therefore, both Felicia Griffin and Eric Moffett are not excluded as a DNA donor . . . .

> 16 loci were tested. For 4 loci, alleles were found that match the victim but not the suspect. This is the basis for the result of "non-exclusion" of the victim for this sample. A closer look at the electropherograms shows that all 6 of these weakly detected alleles fall below a peak height of 200.

Wages then advised that ReliaGene's policy states, "Any sample where the alleles for all loci fall below 200 RFU[4] may be considered inconclusive or re-processed or interpreted with caution at the discretion of the analyst. Samples that bear some but not all loci with alleles that fall below 200 RFU may be called with caution."

¶28.    The record shows that Moffett's trial counsel cross-examined Dr. Nasir about the lack of male DNA found during YSTR testing,[5] the strength or weakness of the DNA mixture evidence on the towel, and the fact that Dr. Nasir could not rule out the existence of additional contributors to the mixture profile because she only compared it against Moffett's and Felicia's known DNA profiles.  In all, the record reflects that Moffett's trial counsel exhibited competent knowledge of the State's DNA evidence and rigorously cross-examined Dr. Nasir utilizing the reports prepared by Wages.  And "[c]ounsel's choice of whether to call

---

[4] RFU stands for Relative Fluorescence Units.

[5] Dr. Nasir explained that YSTR testing targets the Y chromosome and "totally ignores female DNA that is found in the sample, and specifically targets the male DNA so that if there is a very low quantity of male DNA present, then we can detect that." YSTR testing is helpful when a biological sample contains a female victim's DNA and is suspected to contain an unknown male's DNA.

witnesses and ask certain questions falls within the ambit of trial strategy and cannot give rise to an ineffective assistance of counsel claim." ***Bell v. State***, 879 So. 2d 423, 434 (Miss. 2004) (citing ***Jackson v. State***, 815 So. 2d 1196, 1200 (Miss. 2002)).

¶29.     Further, it is significant that Wages acknowledged in his report that Moffett's semen was present on the bed where Felicia was sexually assaulted and murdered and also on the white towel next to her body. Had Moffett's trial counsel called Wages as a witness, he would have to admit to these condemning facts on cross-examination. Very few, if any, competent counsel would allow a jury to hear such damaging evidence to be developed by the State and confirmed by the defense's expert witness. The use of Wages's report to create doubt rather than calling Wages to the stand is presumptively strategic. Moffett has failed to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" ***Stringer***, 454 So. 2d at 477; ***Strickland***, 466 U.S. at 689 (quoting ***Michael v. Louisiana***, 350 U.S. 91, 101, 76 S. Ct. 158, 100 L. Ed 83 (1955)). Because Moffett fails to meet even the first requirement of showing that his trial counsel's performance was deficient, Moffett's claim must fail. ***Foster***, 687 So. 2d at 1130 ("If the post-conviction application fails on either of the ***Strickland*** prongs, the proceedings end." (citing ***Neal v. State***, 525 So. 2d 1279, 1281 (Miss. 1987); ***Mohr***, 584 So. 2d 426)).

**II.     Whether trial counsel rendered ineffective assistance of counsel by failing to present evidence of Moffett's cognitive impairments caused by childhood exposure to lead.**

¶30.     Moffett asserts that his "[t]rial counsel failed to discover and present evidence that suggest Petitioner's cognitive impairments, *which were identified by first post-conviction*

17

*relief counsel* but not fully developed for presentation to the state court, were caused by his childhood exposure to lead." (Emphasis added.)

¶31.    In Moffett's first PCR, he claimed that trial counsel was ineffective for failing to conduct a mental-health evaluation, which he further asserted could have aided in mitigating his sentence. *Moffett*, 156 So. 3d at 846. His PCR counsel presented the affidavits of Tora Brawley, Ph.D., a clinical psychologist from South Carolina; Donna M. Schwartz-Watts, M.D., a forensic psychologist; and one of his trial attorneys, André de Gruy. Moffett also provided a copy of Dr. Brawley's neuropsychological evaluation of Moffett. Regarding those exhibits, the Court recognized the following:

**Tora Brawley, Ph.D.**

Dr. Brawley evaluated Moffett on October 16, 2012, nearly eighteen years after Felicia's murder. According to Dr. Brawley's report, Moffett told her: he has a history of heavy alcohol and marijuana use and once had a three-to-four-month period when he used cocaine on a daily basis; he denied having seizures, headaches, or other neuropsychological difficulties; he reported being "dazed" from a blow received in martial arts sparring; he now suffers from high blood pressure for which he takes medication; he now has mild increases in depression, anxiety, and irritability in reaction to his situation; his maternal uncle had a stroke; and there was no reported history of neurological or psychological difficulties in his family.

While evaluating Moffett, Dr. Brawley performed numerous tests. She opined that the cause of Moffett's mild depression and anxiety most likely was past drug and alcohol abuse. Dr. Brawley further stated that these conditions likely have improved since Moffett's incarceration because he no longer has access to these substances. The results reported in Dr. Brawley's assessment show Moffett to have a WAIS-IV Full Scale IQ of 86 (verbal comprehension 95, perceptual reasoning 82), placing him in the low average range of intellectual functioning. She stated that "testing result[s] revealed the presence of multiple scattered cognitive deficits suggestive of organicity."

**Donna M. Schwartz-Watts, M.D.**

18

Dr. Schwartz-Watts stated in her affidavit, dated February 4, 2013, that she evaluated Moffett on October 4, 2012, and reviewed Dr. Brawley's report. It is Dr. Schwartz-Watts's opinion that Moffett suffers from a life-long anxiety disorder, characterized by excessive anxiety and worry. She attributes this disorder to his drug and alcohol use, stating that, in order to ease his symptoms, Moffett self-medicated with drugs and alcohol.

Dr. Schwartz-Watts stated that Moffett has memory and motor-skills impairments. Further, there are strong indications that he has been exposed to abnormal levels of lead or other heavy metals. She opined that Moffett suffers from a cognitive disorder, which causes impairments in behavior, emotion and impulse control, judgment, problem-solving and memory. Finally, she opines that these conditions existed at the time of Moffett's initial arrest, which was December 31, 1994, and at the time of trial in 2006. She opined that Moffett's impairments could have contributed to his failure to cry and his anger at the crime scene.

**Affidavit of André de Gruy**

The following is an excerpt from the affidavit of de Gruy. His affidavit was provided with Moffett's supplemental motion for post-conviction relief, but it fails to support this claim.

> As addressed in my prior affidavit, I was solely responsible for the mitigation investigation, preparation, and presentation in sentencing. I have been a capital defense counsel from the inception of my legal career in September 1990. I am familiar with the standards of practice in the field, including the American Bar Association's Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, which were first published in 1989 and revised in 2003.
>
> I did not assign a mitigation specialist to Mr. Moffett's case. *I used student interns to conduct some interviews and conducted others myself.* I did not seek or obtain a mental health evaluation. I interviewed Mr. Moffett numerous times and had him moved to the downtown jail to allow for frequent visits by me and the interns. ***I did not see mental health issues as an issue in the case.***
>
> I knew prior to trial that the prosecution intended to rely on evidence of Mr. Moffett's interaction with police officers at the

crime scene to argue consciousness of guilt. The prosecutor also made this clear even during jury selection when she said that no law enforcement officers had ever seen him cry. I did not consider the possibility that his reaction could be explained by a mental health expert, *although we did examine witnesses and argue that his reactions were not indicative of guilt*. Having reviewed the limited mental health evidence current counsel has provided I still do not believe his reactions could be explained by a mental health expert.

. . .

After discovering the child brutally assaulted and killed [Moffett] placed phone calls, talked to people and eventually got angry. He explained his eventual anger as frustration because the police did not appear to be concerned about finding the perpetrator but instead were questioning him.

Prior to trial, I was aware that Mr. Moffett had a history of drug and alcohol use and contacts with the criminal justice system. I was not aware that he had been "dazed" from a blow to the head in a martial arts spar[r]ing match. Mr. Moffett and his family members were fully cooperative with me. The defense team discussed with Eric and his family Eric's involvement in football, possible childhood abuse, accidents he had and the extent of his drug and alcohol use. I don't recall any mention of his involvement in martial arts.

*I cannot say that if I had the mental health evidence that current counsel has provided me I would have attempted to use it in mitigation. It does not appear to be strong mitigation and appears inconsistent with and possibly in conflict with the theory of defense and the **Skipper** mitigation.*[6]

*Moffett*, 156 So. 3d at 846-48 (first and second alterations in original) (footnotes omitted).

¶32.   In denying Moffett's claim that trial counsel was ineffective, the Court stated:

---

6   In ***Skipper v. South Carolina***, the defendant attempted to offer testimony in mitigation to show that he should be spared the death penalty because he would pose no undue danger to his jailers or fellow prisoners and could lead a useful life behind bars if sentenced to life imprisonment. ***Skipper v. South Carolina***, 476 U.S. 1, 106 S. Ct. 1669, 90 L. Ed. 2d 1 (1986).

Moffett's counsel initiated a mitigation investigation in which he participated. Further, the defense elected to present a ***Skipper*** approach in mitigation. After our reading of de Gruy's affidavit and evaluating defense counsel's conduct from their perspective, we find that Moffett failed to carry his burden to establish that the failure to conduct a mental-health evaluation was due to oversight or dereliction. It was a conscious decision. Neither of the affidavits from Moffett's psychologists offers sufficient evidence that warrants a finding of ineffective assistance of counsel. Such evidence in mitigation would have gone against the grain of the mitigation case that was presented. Accordingly, we find this claim of ineffective assistance of counsel does not satisfy the ***Strickland*** standards.

*Id.* at 848.

¶33. Moffett now claims that his trial counsel was ineffective for failing to discover and present evidence that he was exposed to lead as a child and that post-conviction counsel "failed to connect these impairments to [Moffett's] *likely* childhood exposure to lead." (Emphasis added.) He states that exposure to lead can affect brain development resulting in reduced intelligence quotient (IQ), reduced attention span, increased antisocial behavior, and reduced educational attainment. Moffett's first PCR counsel, however, presented the affidavit of Dr. Brawley who, as shown above, found Moffett to have a WAIS-IV Full Scale IQ of 86 (verbal comprehension 95, perceptual reasoning 82), which is in the low average range of intellectual functioning. *Moffett*, 156 So. 3d at 847.

¶34. Moffett now offers his medical records to show that he grew up in Jackson, Mississippi. And he provided the Court with the affidavit of Pamela Blume Leonard, a death penalty mitigation investigator, who states that the house Moffett grew up in was "*likely* to have contained lead-based paint as well as plumbing materials containing lead." (Emphasis added.) Leonard's affidavit also states that "[*t*]*here is reason to believe* that [his] exposure

21

is also attributable to the neighborhood where he grew up" because it was "located between three major thoroughfares . . . when lead based gasoline was used in nearly all cars." Moffett argues that his first PCR counsel did not do enough to connect his cognitive impairments to "*likely* childhood exposure to lead." (Emphasis added.)

¶35. When deciding Moffett's first PCR, the Court considered the affidavit of Dr. Brawley and her opinion that Moffett had "the presence of multiple scattered cognitive deficits suggestive of organicity." *Moffett*, 156 So. 3d at 847 (internal quotation mark omitted). The Court also considered the affidavit of Dr. Schwartz-Watts, who opined that Moffett "suffers from a life-long anxiety disorder, characterized by excessive anxiety and worry." *Id.* She further opined that Moffett has motor-skills impairments, *cognitive deficits*, and that "there are strong indications that he has been *exposed to abnormal levels of lead* or other heavy metals." *Id.* (emphasis added).

¶36. In today's motion for leave to file successive petition for PCR, Moffett offers only that he "likely" was exposed to lead and the damaging effects it may have caused, factors previously considered when Moffett's first PCR counsel presented them as an ineffective assistance of trial counsel claim, which was rejected. The issue is now barred by the doctrine of res judicata. Miss. Code Ann. § 99-39-21(3) (Rev. 2020). Additionally, notwithstanding the bar, Moffett's claim is without merit. Even if Moffett's first PCR counsel were to have presented the arguments that Moffett now makes, Moffett still fails to satisfy the *Strickland* standards. The Court found "Moffett failed to carry his burden to establish that the failure to conduct a mental-health evaluation was due to oversight or dereliction. It was a conscious

22

decision . . . . Such evidence in mitigation would have gone against the grain of the mitigation case that was presented." *Moffett*, 156 So. 3d at 848. And to the extent that Moffett attacks trial counsel's choice of a *Skipper* approach to mitigation rather than one centered on organic brain problems caused by possible lead exposure that was no different than others in the general population, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Wilcher v. State*, 863 So. 2d 719, 733 (Miss. 2003) (quoting *Stringer*, 454 So. 2d at 477; *Strickland*, 466 U.S. at 689). Moffett's claim is without merit.

## CONCLUSION

¶37. Not only is the motion untimely, the Court finds no merit to Moffett's motion for leave to file successive petition for PCR. The first claim does not pass the first prong set forth in *Strickland*. The second claim is barred by res judicata and, notwithstanding the bar, also fails to pass the first prong of *Strickland*. Accordingly, Moffett's motion for leave to file successive petition for PCR is denied.

¶38. **LEAVE TO FILE SUCCESSIVE PETITION FOR POST-CONVICTION RELIEF DENIED.**

**MAXWELL, BEAM, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR. COLEMAN, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. KING, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, P.J.**

**KING, PRESIDING JUSTICE, DISSENTING:**

¶39. Because the majority's finding that Moffett's ineffective assistance of post-conviction

23

relief (PCR) counsel claim is untimely when no statute of limitations exists violates the separation of powers between the legislative department and the judicial department and results in decided prejudice against prisoners, I dissent.

¶40.    The Constitution of the State of Mississippi provides that "[t]he powers of the government of the State of Mississippi shall be divided into three distinct departments, and each of them confided to a separate magistracy, to-wit: those which are legislative to one, those which are judicial to another, and those which are executive to another." Miss. Const. art. 1, § 1. "No person or collection of persons, being one or belonging to one of these departments, shall exercise any power properly belonging to either of the others." Miss. Const. art. 1, § 2.

¶41.    The United States Supreme Court previously has discussed the proper roles of the legislative and judicial branches, stating that "[t]he Legislature [is] possessed of power to 'prescrib[e] the rules by which the duties and rights of every citizen are to be regulated,' but the power of '[t]he interpretation of the laws' [are] 'the proper and peculiar province of the courts.'" *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 222, 115 S. Ct. 1447, 131 L. Ed. 2d 328 (1995) (third and fourth alterations in original) (quoting The Federalist No. 78 (Alexander Hamilton)). It continued, stating that the "Judiciary [is], 'from the nature of its functions, . . . the [department] least dangerous to the political rights of the constitution,' not because its acts [are] subject to legislative correction, but because the binding effect of its acts [are] limited to particular cases and controversies." *Id.* at 223 (second alteration in original) (quoting The Federalist No. 78).

24

¶42. This Court has warned against usurping legislative power, urging that the Court "must resist by the exercise of judicial self restraint and limit our role to the judicial power granted the judicial department under our Constitution." *Kelly v. Miss. Valley Gas Co.*, 397 So. 2d 874, 877 (Miss. 1981). The legislature has not created an statute of limitations that applies to ineffective assistance of PCR counsel claims. However, the majority claims that Moffett's ineffective assistance of PCR counsel claims are untimely, relying heavily on one-year statutes of limitations applicable to other types of claims and ignoring that "[l]imitations on the time within which an action must be brought are created by statute only. They are legislative, not judicial acts." *Shewbrooks v. A.C. & S., Inc.*, 529 So. 2d 557, 564 (Miss. 1988), *superseded by statute on other grounds as stated in* *N. Am. Midway Entm't, LLC v. Murray*, 200 So. 3d 437, 439 n.4 (Miss. 2016); *see also* 54 C.J.S. *Limitations of Actions* § 1 ("A statute of limitations limits the time within which an action must be brought and is a legislative rather than judicial act . . . ."). This Court later reaffirmed that the creation of limitation periods is the duty of the legislature, providing that

> The establishment of these time boundaries is a legislative prerogative. That body has the right to fix reasonable periods within which an action shall be brought and, within its sound discretion, determine the limitation period . . . .
>
> Deficiencies, if such there should be, in statutes of limitation should be remedied by the legislature. It should not be the province or function of this court to intrude upon an area peculiarly within the channel of legislative action. . . .

*Miss. Dep't of Pub. Safety v. Stringer*, 748 So. 2d 662, 665–66 (Miss. 1999) (alterations in original) (quoting *Smith v. Sneed*, 638 So. 2d 1252, 1263 (Miss. 1994) (Hawkins, C.J., dissenting)). The United States Supreme Court also has recognized that the authority to create

limitation periods is in the legislature's sole control. *See **Plaut***, 514 U.S. at 228 ("First, there is the fact that the length and indeed even the very existence of a statute of limitations upon a federal cause of action is entirely subject to congressional control.").

¶43. "It is not our province to write the statutes, but only to construe them as written." ***Zambroni v. State ex rel. Hawkins***, 217 Miss. 418, 64 So. 2d 335, 337 (1953). The majority's reliance on other statutes of limitations as "a guide to timeliness" is both misplaced and gives petitioners no real guidance as to when this Court may decide to find petitions untimely. Maj. Op. ¶ 16. This Court consistently holds

> that where a statute enumerates and specifies the subject of things upon which it is to operate, it is to be construed as excluding from its effect all those not expressly mentioned or under a general clause, those not of like kind or classification as those enumerated.

***GEICO Cas. Co. v. Stapleton***, 315 So. 3d 464, 468 (Miss. 2021) (quoting ***Jones v. Fluor Daniel Servs. Corp.***, 32 So. 3d 417, 422 (Miss. 2010), *overruled on other grounds by **Stapleton***, 315 So. 3d 464). This Court in ***Stapleton*** found that an action not specifically listed in a specific statute of limitations was not subject to that statute; it instead fell under the general catchall statute of limitations. ***Id.*** at 468.

> Per the Legislature's own language, [Section 99-39-5] specif[ies] "the subject matter of things upon which it is to operate" and should be "construed as excluding from its effect all those not expressly mentioned."

***Id.*** (quoting ***Jones***, 32 So. 3d at 422). Thus, the majority relying on other statutes of limitations for guidance, when those statutes do not apply to ineffective assistance of PCR counsel claims, is inappropriate and amounts to this Court creating a statute of limitations by implication. Moreover, if these one-year statutes of limitation are merely "guidance,"

26

upon what legal standard may petitioners rely to ascertain whether their claims are untimely?[7]

¶44. The majority's imposition of a new and undefined limitations period defies the warning stated in *Kelly* by its infringement into legislative territory. The majority cites case law regarding the finality of convictions and the importance of undue delay in support of its holding. However, the cases cited by the majority contain no authority to prescribe a limitation period. In *Hill v. McDonough*, the United States Supreme Court denied a petitioner's request for a stay of execution but imposed no limitation period in violation of the separation of powers. *Hill v. McDonough*, 547 U.S. 573, 584, 126 S. Ct. 2096, 165 L. Ed. 2d 44 (2006). The majority also utilizes *Bucklew v. Precythe* in support of its reasoning that courts should guard against unjustified delay. Maj. Op. ¶ 14; *Bucklew v. Precythe*, 139 S. Ct. 1112, 2203 L. Ed. 2d 521 (2019). Yet in *Bucklew*, the defendant had already "exhausted his appeal and separate state and federal habeas challenges . . . ." *Id.* at 1133. He also had secured "two 11th-hour stays of execution" and had filed the challenge at issue days before his scheduled execution. *Id.* at 1134. Again, the Supreme Court imposed no limitations period but affirmed the denial of a stay of execution by the district court and the United States Court of Appeals for the Eighth Circuit. *Id.* at 1119. *Calderon v. Thompson* also gives this Court no authority to create a limitation period. There, the Supreme Court

---

[7]This Court has recently begun a concerning pattern of supplanting judicial sensibilities regarding what the judiciary finds dilatory for legislatively enacted statutes of limitation. For example, in *Leasy v. SW Gaming, LLC*, this Court approved a finding that a complaint filed within the legislatively enacted statute of limitations was nonetheless dilatory. *Leasy v. SW Gaming, LLC*, 335 So. 3d 555, 560-62 (Miss. 2022) (King, P.J., dissenting). Courts should not be upending statutes of limitation based on vague and undefined notions of what is dilatory. Courts are obligated to apply statutes of limitation unless those limitations infringe upon a higher constitutional mandate.

27

decided a federal court of appeals' recall of its mandate denying federal habeas relief. *Calderon v. Thompson*, 523 U.S. 538, 556, 118 S. Ct. 1489, 140 L. Ed. 2d 728 (1998).

¶45.    Further, I would find that the majority's reasoning regarding the timely enforcement of sentences falls particularly flat in cases involving the penalty of death. As Justice Breyer wrote in his dissenting opinion in *Bucklew*, although some delays in death penalty cases are excessive, the "majority appears to believe that because '[t]he Constitution allows capital punishment,' the Constitution must allow capital punishment to occur quickly." *Bucklew*, 139 S. Ct. at 1145 (Breyer, J., dissenting) (alteration in original) (citation omitted). Justice Breyer continued, stating that "[t]his case adds to the mounting evidence that we can either have a death penalty that avoids excessive delays and 'arguably serves legitimate penological purposes,' or we can have a death penalty that 'seeks reliability and fairness in the death penalty's application' . . . ." *Id.* (quoting *Glossip v. Gross*, 576 U.S. 863, 938, 135 S. Ct. 2726, 192 L. Ed. 2d 761 (2015) (Breyer, J., dissenting)). I agree with Justice Breyer and with Justice Sotomayor's statement that "[t]here are higher values than ensuring that executions run on time." *Id.* at 1148 (Sotomayor, J., dissenting).

¶46.    As now-Chief Justice Randolph has stated, "[o]ur Constitution requires strict adherence to the doctrine of separation of powers. . . . I would respectfully urge the Supreme Court to exercise judicial restraint, as the function of all courts is to adjudicate, not to legislate. Courts are charged with the responsibility to interpret, not create law." *Dycus v. State*, 910 So. 2d 1100, 1102 (Miss. 2005) (Randolph, J., specially concurring). Because the majority lacks authority to create a limitations period and violates the doctrine of separation

28

of powers in doing so, I fervently dissent.

**KITCHENS, P.J., JOINS THIS OPINION.**